[No. A062468. First Dist., Div. Two. June 14, 1995.]

LINDA E. STANLEY, Plaintiff and Appellant, v.
DIANA RICHMOND et al., Defendants and Respondents.

**COUNSEL**

Moore & Moore and Howard Moore, Jr., for Plaintiff and Appellant.

Plastiras & Forsblad and Basil Plastiras for Defendants and Respondents.

**OPINION**

**PHELAN, J.**—Linda E. Stanley (appellant) timely appeals from a judgment of nonsuit entered as to her claims for breach of fiduciary duty, legal malpractice, and breach of contract. These claims against respondents Diana Richmond (Richmond or respondent) and her law firm, Richmond & Chamberlin (collectively, hereinafter, respondents), arose out of a dissolution proceeding in which Richmond represented appellant, and C. Rick Chamberlin (Chamberlin), an attorney with whom Richmond was in the process of forming a new law firm, represented appellant's husband, Dr. John Stanley (Dr. Stanley). At the close of appellant's evidence in a jury trial, the court granted respondents' motion for nonsuit (Code Civ. Proc., § 581, subd. (c)), ruling that appellant was required—and failed—to present expert testimony on the applicable standard of care for family law attorneys, and that appellant failed to present evidence that, but for Richmond's alleged breach(es) of fiduciary duty, appellant would have obtained a better result in the dissolution proceedings.

We conclude that appellant established a prima facie case of breach of fiduciary duty, professional negligence, and breach of contract. Accordingly, we reverse the judgment of the trial court and remand for a new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Viewed in the light most favorable to appellant, with all presumptions, inferences and doubts resolved in her favor (*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 838-840 [206 Cal.Rptr. 136, 686 P.2d 656]), the evidence presented to the trier of fact was as follows.

Appellant and Dr. Stanley were married in 1958 and separated on January 6, 1986. When the couple separated, appellant moved out of the family home. Dr. Stanley petitioned for dissolution of the marriage in June 1986.

Appellant is a litigation attorney specializing in bankruptcy matters. She was a partner in the law firm of Dinkelspiel & Dinkelspiel until June 1986, when she left to start a new firm, Taylor & Stanley. On February 1, 1989, Taylor & Stanley was acquired by Nossaman, Gunther, Knox & Elliot (the Nossaman firm), a statewide general service law firm with its main offices in Los Angeles and San Francisco.

In June 1987, appellant retained Richmond to represent her in the marital dissolution proceedings. At the time, Richmond's law offices were located at 100 Embarcadero Center in San Francisco, in space she subleased from the Nossaman firm. Richmond's written retainer agreement provided that, "We will exert our best efforts on your behalf consistent with the canons of ethics of the legal profession, to provide legal counsel, advice, and representation."

Dr. Stanley retained Chamberlin as his attorney for the dissolution proceedings in or about February 1988. Chamberlin was at the time a partner with Stotter, Chamberlin & Coats, whose offices were at 1735 Franklin Street in San Francisco.

A. *June 1988 Trial re Division of Marital Property.*

A three-day trial on the marital property issues was held in June 1988. Two of the issues at trial were the division of the family residence in Belvedere, which was valued at $825,000, and disposition of Dr. Stanley's University of California (UC), Veterans' Administration (VA), and "TIAA/ CREF" retirement accounts. The retirement accounts were worth over $600,000 in the aggregate. Another asset subject to distribution at trial was appellant's Dinkelspiel & Dinkelspiel partnership withdrawal payments. Appellant and Dr. Stanley stipulated before trial that the community property interest in those payments was $37,600.

At the end of the trial, the court denied appellant's request to award her the family residence and ordered the home sold, but provided that either party could bid on the property. The court further ordered that the Dinkelspiel & Dinkelspiel payments be awarded to appellant, and that Dr. Stanley's retirement plans should be divided equally in kind. On June 21, 1988, the parties were directed to draft a proposed final judgment for the court's approval. Over the following eight months, the parties continued to dispute

many specifics of the property division, and exchanged six drafts of the form of judgment before finally settling the matter.[1]

### B. *Posttrial Efforts to Finalize the Marital Property Division.*

After the trial of the property issues was concluded, appellant began to complain that Richmond had become ineffectual in efforts to wind up the dissolution. For example, on December 9, 1988, appellant wrote to Richmond and expressed concern about Richmond's apparent unwillingness to challenge Chamberlin on key issues. Unknown to appellant, Richmond had met with Chamberlin in July or August of 1988 and invited him to join her in the practice of law. Richmond wanted Chamberlin to relocate with her when she moved her offices later in the year. At that time, Chamberlin declined the invitation and Richmond claimed she "abandoned that concept."

In or about October 1988, Dr. Stanley listed the Belvedere house for sale, at an asking price of $1,150,333. Dr. Stanley thereafter received several offers on the property, none of which was acceptable. At the time, appellant was unable to bid on the house because her law firm, Taylor & Stanley, was doing poorly.

Also in October 1988, however, appellant's financial situation began to change. That was when she began negotiating an employment agreement with the Nossaman firm, to begin working there on February 1, 1989. Her new salary would improve her financial condition considerably.

On January 12, 1989, an acceptable all-cash offer to purchase the Belvedere home for $1,008,000 was made by Paul and Elizabeth Wiser (the Wiser offer). At that time, appellant did not specify terms on which she would buy Dr. Stanley's interest in the house, but she did authorize respondent to convey to Dr. Stanley her intent to exercise her right of first refusal.

Less than two weeks later, on January 23, Richmond received a telephone call from Chamberlin in which he reportedly said Dr. Stanley was becoming impatient and had instructed him to bring a motion to compel acceptance of the Wiser offer unless appellant came up with specific, acceptable terms. When Richmond called to tell appellant of the threatened motion, appellant initially said she was too busy dealing with the Nossaman firm about her new employment arrangements. Later the same day, however, appellant called Richmond back to say she had struck a deal with the Nossaman firm and to propose paying Dr. Stanley "$250,000 via a loan." On January 24,

---

[1]At least two of these drafts were exchanged after Richmond's alleged conflict of interest arose.

Richmond wrote to appellant setting forth terms—specifically a $360,000 purchase price—under which Chamberlin had indicated Dr. Stanley would agree to appellant's purchase of his share of the house. Apparently, Chamberlin also informed Richmond that, if appellant obtained a $250,000 bank loan, Dr. Stanley might be willing to take a note from appellant for the $110,000 balance.

Appellant testified that the pressure Dr. Stanley and the two lawyers were applying to compel sale of the house in late January was inappropriate, unnecessarily intense, and contrary to the family court's orders. Under all versions of the proposed final judgment in the dissolution action, appellant had a fixed period of time—90 days—from acceptance of a third party offer to purchase her husband's interest in the Belvedere house. The Wiser offer was made on or about January 12, and appellant communicated her intent to exercise her rights of first refusal on the same date. Appellant thus had until at least April 12 to obtain financing to buy out Dr. Stanley.

A plausible reason for the intense pressure surfaced within two days after appellant learned about Chamberlin's plan to compel sale of the house. On or about January 25, Chamberlin called Richmond to inquire if she was still interested in having him join her in the practice of law. Richmond told Chamberlin that she was, indeed, still interested, and agreed to check if there was additional space in the building where she had leased offices to relocate her law practice.

Also on January 25, Richmond called appellant to tell her that she and opposing counsel Chamberlin were "seriously discussing taking offices together within the next 60 days." Richmond confirmed their conversation in a letter dated January 26. Stanley testified about her reaction to Richmond's news: "My first impression was to laugh in disbelief. I was just amazed that here I was in a situation where the opposing counsel and my attorney were going to go [in]to practice or going to share offices together. But I said, well, that's all the more reason to get this judgment finished, which has languished all this time." Stanley further testified that she understood "taking offices together" to mean that Richmond and Chamberlin would be renting space in the same building—as Richmond had done with the Nossaman firm—but not that they would be starting a new law firm together. Apparently, Richmond's and Chamberlin's plan was to open the new law firm within 60 days of January 25, i.e., by March 26, when Richmond's sublease with the Nossaman firm expired.[2] In a curious twist of the concept of attorney-client confidentiality, Richmond asked appellant to keep the information private as it was "not yet general knowledge." In her confirming

---

[2]In fact, Richmond and Chamberlin probably began practicing fewer than 60 days after giving appellant notice of their plan. On or about March 22, 1989, appellant received some

letter of January 26, Richmond also noted that her plan to go into practice with Chamberlin was "yet another reason to conclude your dissolution as soon as we possibly can."

Contrary to Richmond's representations to her client on January 25 and 26 that she and Chamberlin were merely "discussing taking offices together," a jury could infer from their conduct that, by that time, they had already agreed to go into practice together and were actively organizing their new law firm, Richmond & Chamberlin. Richmond admitted that within 48 hours of her telephone call to appellant on January 25, she and Chamberlin met with a realtor to acquire additional office space for their new law firm. While continuing to represent opposing parties in ongoing litigation, Richmond and Chamberlin also selected associates (from among the attorneys employed by their separate law firms), stationery, forms of retainer, announcements, computers, and a telephone system for Richmond & Chamberlin. A bank account was also established in the firm name at Wells Fargo Bank. By February 1, Richmond and Chamberlin had made arrangements for the additional office space Chamberlin needed. Attorney fees due Chamberlin from the proceeds of the sale of the Belvedere house would be used to finance his move into Richmond's law offices.

On Friday, January 27, Richmond sent Chamberlin a detailed offer under which appellant would buy Dr. Stanley's share of the Belvedere house for $250,000 cash, with a note to Dr. Stanley for the balance of the suggested $354,000 purchase price. As part of that proposal, Richmond suggested that the UC pension be used as necessary to equalize the division of community property assets. That same day, Chamberlin served a motion to compel appellant to accept the Wiser offer and to obtain appointment of a receiver if appellant refused to join in the sale. The motion was noticed for hearing on February 16. Appellant's responsive pleadings were, thus, due by noon on Thursday, February 9. Appellant instructed Richmond in writing to "get this off calendar & negotiate with Rick" about her offer to buy Dr. Stanley's interest in the house. She also called Richmond early in the week of January 30 to ask her to "ensure that [Dr. Stanley's] motion to compel the sale of the house is taken off calendar."

Also on January 27, Dr. Stanley delivered a handwritten note to his ex-wife at her San Francisco apartment. Appellant interpreted her ex-husband's note, entitled "Rough Outline of John's Proposal," as an offer to sell the house. Accordingly, she faxed a purported acceptance directly to Chamberlin, saying that she had applied for bank loans in the amount of $550,000

---

papers in an envelope bearing a mailing label with the firm name "Richmond & Chamberlin" printed on it.

and that she accepted Dr. Stanley's suggestion that any shortfall be made up out of her share of the UC retirement account. After obtaining approval from Richmond's office, Chamberlin responded directly to appellant, saying that Dr. Stanley's note was not intended as an offer and that he would be responding to Richmond's January 27 letter by February 8.

On Thursday, February 2, Richmond dictated a letter to appellant, saying that she had discussed appellant's January 27 offer with Chamberlin, and that Dr. Stanley was likely to reject any proposal that would require him to accept a note from appellant or remain obligated on the existing mortgage. In the same letter, Richmond informed appellant that she would be out of the office until Wednesday, February 8, on business and a ski trip. Richmond also responded to her client's demand that Chamberlin's motion to compel be taken off calendar, as follows: "This is not reasonably achievable no matter who opposing counsel is. The fact is that the two of you have a favorable offer. Either it should be accepted or you should buy out [Dr. Stanley] on reasonable terms. If we have to argue the motion, you should know that our responsive papers are due with the court no later than February 9, 1989, and my prediction is that the judge would allow the other offer to go forward unless you can truly match its terms." Richmond did not explain when or how she would be defending appellant against Chamberlin's motion to compel sale of the house.

On Friday, February 3, appellant wrote to Richmond to reiterate her desire to exercise her right of first refusal, and to describe her efforts to obtain appropriate bank financing. She informed Richmond that she considered Dr. Stanley's and Chamberlin's pursuit of the motion to compel sale to be sanctionable in the circumstances, and admonished Richmond to "[b]e an advocate."

On Tuesday, February 7, appellant wrote to Chamberlin and threatened to seek to disqualify him because of a conflict of interest, saying, "Business partners should not be representing parties on the opposite sides of the lawsuit." On the same day, appellant responded to Richmond's February 2 letter and complained that she had been unavailable and ineffective in representing appellant's interests. Appellant also specifically charged that she was being "adversely affect[ed]" by Richmond's conflict of interest "now that you and Rick will be practicing in the same offices starting on March 1."

When Richmond returned from her ski trip on Wednesday, February 8, she served a substitution of attorneys by which she would have been replaced as counsel of record by appellant proceeding in propria persona. In

her brief, Richmond describes this action as a "response to appellant's loss of confidence." Appellant refused to sign the substitution form because she did not believe she could competently represent herself or obtain new counsel on such short notice. When Richmond served appellant with the substitution form, she knew that appellant was trying to arrange new counsel, but that the attorney she had selected, John McCall, could not appear in the action until March 3 or March 10 at the earliest.

Also on February 8, Chamberlin responded to appellant's January 27 proposal to buy Dr. Stanley's interest in the house. In that letter, Chamberlin suggested for the first time that appellant cede her interest in Dr. Stanley's VA pension—rather than a portion of his UC retirement account—as an "equalizing mechanism" in appellant's purchase of the house.

On February 9, Richmond filed a two-paragraph opposition to Chamberlin's motion to compel, arguing only that a sale to third parties would result in adverse tax consequences for both appellant and her ex-husband. Richmond mentioned appellant's right of first refusal, but she did not inform the court that appellant had a full 90 days (until at least April 12) to consummate her own purchase of the house. Also on February 9, Richmond filed an ex parte motion to withdraw from the case, and to continue the hearing on Chamberlin's motion. The ex parte motions were put over for hearing with Chamberlin's motion on February 16.

On February 14, appellant met with Richmond and asked her for advice about "the pluses and minuses of John's taking all of the [VA] Retirement Plan rather than substantially all of the [UC] Voluntary Plan." After discussing the matter with an actuary and analyzing the practical advantages of retaining rights to the UC pension and disadvantages of "taking an actuarial value of a pension versus dividing it in kind," but without doing any research on the law governing federal pensions, Richmond advised appellant to waive her interest in the VA pension.

On February 16, the parties appeared in Marin County Superior Court, only to discover that the assigned judge was not present and that the motion would be heard by Judge Beverly Savitt. Judge Savitt was willing to accept a disqualification because she had previously served as a settlement judge in the case. Instead of proceeding before a different judge on her motions for a continuance and to withdraw from the case, however, Richmond met with appellant in the corridor of the Marin County Superior Court and induced her to enter into a settlement which was read into the record. Appellant objected that she did not understand the agreement she was being asked to make. In response, Richmond told her client, "Don't be a baby, this is the

way you will get your house." Appellant explained that she went ahead with the settlement "at the request of Diana Richmond," as follows: "I was—I had—I had a lawyer who was—basically abandoned me, and I was looking at losing my house, and she said that's the only way I could get the house, so I walked in and agreed."

Under the terms of the settlement entered on the record on February 16, appellant ceded her entire interest in Dr. Stanley's VA pension to him, received the entire cash settlement from the buyout of her partnership interest in Dinkelspiel & Dinkelspiel without any allowance for the tax consequences to her, and approved a division of the community property which miscalculated the amount of rent due the community from the Dr. Stanley's use of the family home during the pendency of the dissolution.

On February 28, appellant received a copy of Chamberlin's draft of the proposed judgment, which was to reflect the February 16 agreement. She immediately realized that, even though she had ceded both her interest in the VA pension and another asset, there was a $70,000 shortfall in the plan for her to purchase the Belvedere house.

On March 7, at appellant's insistence, Richmond prepared and filed a motion to set aside the February 16 agreement on the ground that the stipulation was "based on mistaken fact, mistaken values, because of [Dr. Stanley's] misrepresentations and clerical error." Richmond demanded that appellant delete from her supporting declaration a passage in which she had described the February 16 agreement as "the hurried product of two lawyers with a conflict anxious to get out of the case." Richmond also refused to allow appellant to make any reference to the conflict of interest created by the formation of her law firm with opposing counsel because, she claims, "[I]t wasn't true." However, Richmond did include arguments that appellant entered into the stipulation under "an honest mistake of the facts," and that "[appellant's] mistake can be inferred from the totality of the confused and pressured atmosphere surrounding the making of the stipulation and the fact that its terms run counter to her purpose in making it."

On March 15, John McCall substituted into the case to represent appellant. McCall felt that his hands were tied with respect to obtaining relief from the February 16 settlement. Confronted with that situation, McCall arranged a four-way meeting between himself, appellant, Chamberlin, and Dr. Stanley. At that meeting, McCall was able to secure an agreement which permitted appellant to buy Dr. Stanley's interest in the house, but was unable to modify the settlement in any other respect. McCall attributed his limited

success, in part, to Dr. Stanley whom he described as "aggressively mean-spirited concerning these negotiations." Appellant paid McCall fees totaling $2,290.60 to "mitigate the damages caused by Richmond's conflict of interest."

In August 1989, appellant learned that, although she was an otherwise eligible unremarried ex-spouse of a civil service employee, she was not allowed to enroll in the Federal Employees' Health Benefits (FEHB) Program because she had ceded her entire interest in Dr. Stanley's VA pension. Had she retained a minimum $1 interest in the VA pension, she would have been eligible for lifetime health insurance from the FEHB at very low cost, as well as a possible survivor's annuity.

On August 18, 1989, appellant wrote to Richmond and asked if she knew appellant would have been eligible for FEHB health insurance if she had reserved a $1 interest in Dr. Stanley's civil service pension as a part of the February 16 settlement. Richmond replied that she "did not know" appellant was thereby foreclosed from receiving the federal benefits.

C. *Expert Testimony re Breach of Fiduciary Duty and Malpractice.*

Professor Richard Zitrin, an expert in legal ethics, testified that Richmond had a conflict of interest as of January 25, as follows: "She had decided just at a time when a lot of things were happening on the case, particularly relating to the house, the Stanley house, that she and Mr. Chamberlin were going to join forces in some way and open a law office, and that created a conflict of interest between her desire to open a law office with Mr. Chamberlin, who is opposing counsel, and her obligation to represent [appellant] in the domestic relations matter." Professor Zitrin further opined that the conflict was not adequately disclosed to appellant by the January 26 letter. Rather, he said, when the conflict of interest arose, Richmond had an obligation to inform appellant of the nature and consequences of the conflict and to obtain her informed written consent to continued representation. Richmond did neither. Zitrin also testified that Richmond breached her duties to her client by forcing appellant to remove from her declaration for the March 7 motion the statement that the erroneous judgment was "the hurried product of two lawyers with a conflict anxious to get out of the case." He said this was a violation of the client's right to control the litigation, and an effort by Richmond to protect her own interests over those of her client.

Professor Zitrin further testified that Richmond violated rule 5-102 (A) of the California Rules of Professional Conduct[3] (rule 5-102) which provides, in relevant part: "A member of the State Bar shall not accept professional employment without first disclosing his relation, if any, with the adverse party, and his interest, if any, in the subject matter of the employment. A member of the State Bar who accepts employment under this rule shall first obtain the client's written consent to such employment." He explained that Mr. Richmond acquired an interest in the subject matter of the representation when "she and Chamberlin decided to become office mates and take steps in that direction," and that she violated rule 5-102 by failing to make full disclosure of the nature and consequences of her conflict of interest and of her relationship with an adverse party, Dr. Stanley, a relationship which "flowed through Mr. Chamberlin." Given that she did not have her client's informed consent to the conflict, Richmond had a further duty to withdraw as soon as practical, but only after taking "reasonable steps to avoid foreseeable prejudice to the rights of [her] client, including giving due notice to [the] client [and] allowing time for employment of other counsel . . . ." (Former rule 2-111; see also rule 3-700(A)(1)(2).)

At the end of Professor Zitrin's testimony, the court denied a motion by respondents' counsel for a ruling as a matter of law that there had been no violation of rule 5-102. The court ruled that, under a proper instruction pursuant to rule 5-102, the jury would decide as a matter of fact whether Richmond had violated her fiduciary duties to appellant.

Richmond designated herself as an expert on the standards of care applicable to family law specialists, and appellant exercised her right to call Richmond in her case-in-chief to testify on that issue. (See Evid. Code, § 776.) In that regard, Richmond testified that she owed appellant a duty to "use diligence, skill and prudence" in her performance of professional services, and to "make reasonable research into the [VA] existing statutes and regulations.pertaining to the matters" about which she was advising appellant, at least "[t]o the extent [she] didn't already know them." As a family law specialist, and as part of her duty of "due diligence," she also said

---

[3]All references to rules in this case will be to the California Rules of Professional Conduct which were in effect in from June 1987 through March 1989, while Richmond was representing appellant in the dissolution action. Those rules were significantly revised and renumbered, effective May 27, 1989, and amended again in August 1992. "Former rule 5-102 (as well as former rule 4-101 [requiring attorneys to preserve the confidentiality of client matters]) became part of current rule 3-310 following [the Supreme Court's] adoption of the revised Rules of Professional Conduct of the State Bar of California on November 28, 1988. The former rules governing attorneys' duties of confidentiality and loyalty were thus consolidated into a single rule." (*Flatt* v. *Superior Court* (1994) 9 Cal.4th 275, 288, fn. 5 [36 Cal.Rptr.2d 537, 885 P.2d 950].)

she had a duty "[t]o keep abreast of changes in family law." Richmond defined "research" as including both factual and legal research, the latter involving "looking at the law to see what the law is," and "looking to see if the law has changed since you last looked at it." She further opined that "the research that one does should be proportional to the task assigned."

With respect to the services at issue in this case, Richmond testified that "The task assigned to me was to weigh these pensions," and to "compare and advise [appellant] of the [UC] retirement with the [VA] pension." She admitted that there was plenty of money in the UC retirement account to equalize the property division and that, in fact, appellant's preference had consistently been "to use the [UC] retirement to make up the shortfall." Richmond also acknowledged that she knew there were federal regulations governing Dr. Stanley's VA pension, and that the law governing federal pensions had "changed dramatically and unexpectedly over time," but that she did not consult them to formulate her advice to appellant and had not done so "for a considerable period" before appellant asked her to research the pension issues. She thus failed to discover that, by retaining at least a $1 interest in the VA pension, appellant could have participated in the low-cost federal health insurance programs.[4] Richmond, nevertheless, advised appellant to give up her entire interest in the VA pension.

James Petray, a certified public accountant who prepared appellant's tax returns, testified about the tax effect of appellant's receipt of the Dinkelspiel settlement payments. He said she incurred a tax liability of $14,312 in tax years 1988 and 1989, which was directly traceable to the Dinkelspiel payments, and that this amount was reasonably ascertainable both at the time of trial in June 1988 and at the time of settlement in February 1989.

D. *The Judgment of Nonsuit.*

At the conclusion of appellant's case-in-chief, the trial court invited Richmond to move for nonsuit pursuant to Code of Civil Procedure section 581, subdivision (c). The court believed appellant was required and failed to present testimony from a family law expert to show that Richmond's conduct fell below the standard of care for professional negligence, and that appellant would have obtained a more favorable settlement if she had had conflict-free counsel. The court did not draw any distinction between appellant's three causes of action, and applied the same malpractice standards to

---

[4]Appellant made an offer of proof that retaining a $1 interest in the VA pension would have yielded lifetime benefits worth $14,000 to $150,000, depending on the assumptions used to calculate the value of the benefits. The trial court deemed it unnecessary to hear testimony from appellant's damages expert on this issues before hearing Richmond's nonsuit motion.

each. This timely appeal followed entry of an order granting Richmond's motion for nonsuit.

## II. Discussion

The issue presented in this appeal is whether appellant presented substantial evidence—including any required expert testimony—to support a prima facie claim of breach of fiduciary duty, professional negligence, and/or breach of contract. (See *Diesel Electric Sales & Service, Inc.* v. *Marcos Marine San Diego, Inc.* (1993) 16 Cal.App.4th 202, 211 [20 Cal.Rptr.2d 62].) ■ "In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give 'to the plaintiff['s] evidence all the value to. which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor . . . .' " (*Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 118 [184 Cal.Rptr. 891, 649 P.2d 224].)

### A. *Professor Zitrin's Expert Testimony Was Sufficient to Establish Both the Duty and Breach Elements of a Cause of Action for Breach of Fiduciary Duty.*

Appellant first contends that the trial court erred by applying the same evidentiary standards to each of her three claims. More specifically, she argues that it was error to require testimony from a family law expert about the negligence standard of care in order to make a prima facie showing of breach of fiduciary duty. ■ Appellant is, of course, correct that a breach of fiduciary duty is a species of tort distinct from a cause of action for professional negligence. (*Barbara A.* v. *John G.* (1983) 145 Cal.App.3d 369, 382-383 [193 Cal.Rptr. 422]; cf. *Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433] [elements of cause of action for professional negligence].) The elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach. (*Pierce* v. *Lyman* (1991) 1 Cal.App.4th 1093, 1101 [3 Cal.Rptr.2d 236].)

The scope of an attorney's fiduciary duty may be determined as a matter of law based on the Rules of Professional Conduct which, "together with statutes and general principles relating to other fiduciary relationships, all help define the duty component of the fiduciary duty which an attorney owes to his [or her] client." (*Mirabito* v. *Liccardo* (1992) 4 Cal.App.4th 41, 45 [5 Cal.Rptr.2d 571]; *David Welch Co.* v. *Erskine & Tulley* (1988) 203

Cal.App.3d 884, 890 [250 Cal.Rptr. 339].) Whether an attorney has breached a fiduciary duty to his or her client is generally a question of fact. (*David Welch Co.* v. *Erskine & Tulley, supra,* 203 Cal.App.3d at p. 890.) Expert testimony is not required (*id.* at pp. 892-893), but is admissible to establish the duty and breach elements of a cause of action for breach of fiduciary duty where the attorney conduct is a matter beyond common knowledge (*id.* at p. 893; *Mirabito* v. *Liccardo, supra,* 4 Cal.App.4th at pp. 45-46; see also *Day* v. *Rosenthal* (1985) 170 Cal.App.3d 1125, 1146-1147 [217 Cal.Rptr. 89]).

Professor Zitrin's testimony about the Rules of Professional Conduct and the common law of attorney fiduciary duty, and his opinions that Richmond violated her duties under each, were plainly sufficient to establish the first two elements of a cause of action for breach of fiduciary duty. Indeed, when taken together with Richmond's own expert testimony and her denials, Zitrin's testimony was more than sufficient to raise questions of fact whether Richmond had an actual conflict of interest by virtue of her agreement to go into practice with Chamberlin, whether she obtained an informed consent to her continued employment as appellant's counsel of record after that conflict arose, whether her representation of appellant was compromised by her relationship with Chamberlin, and whether she breached her fiduciary duties with respect to withdrawal from the action.

While there was no evidence that Richmond actively participated in advising her client's ex-husband, Professor Zitrin provided two theories under which appellant could establish that Richmond's loyalty to appellant was impaired by her agreement to go into practice with Chamberlin before the dissolution action was wrapped up. First, by entering into and commencing performance under an agreement to form a new law firm with her opposing counsel, Richmond arguably moved into an attorney-client relationship with Dr. Stanley that "flowed through" her prospective law partner, Chamberlin. Notwithstanding the fact that she and Chamberlin were not yet sharing office space, a jury could reasonably find that, by assuming such a position without obtaining written consent from appellant, Richmond (and Chamberlin) violated both the literal proscription on simultaneous representation of conflicting interests (rule 5-102(A) & (B)), and the common law fiduciary duties she owed to appellant. (Cf. *Jeffry* v. *Pounds* (1977) 67 Cal.App.3d 6, 9-11 [136 Cal.Rptr. 373] [attorney violated rule 5-102(B) by representing client in a personal injury matter while, without the knowledge and consent of the client, another partner in same law firm was representing client's wife in divorce action]; see also *Truck Ins. Exchange* v. *Fireman's Fund Ins. Co.* (1992) 6 Cal.App.4th 1050, 1056 [8 Cal.Rptr.2d 228], [law firm "created conflict" by assuming representation of plaintiff company A

against defendant company B and concurrently representing subsidiary of B in unrelated litigation, and violation of rule 3-310(B) could not be cured by dropping subsidiary of B like a "hot potato" in order to continue representation of A]; *Cinema 5, Ltd.* v. *Cinerama, Inc.* (2d Cir. 1976) 528 F.2d 1384, 1386-1387 [conduct of lawyer was "prima facie improper" where he represented client as a defendant in an antitrust action, while his law partner sued the same client in a different court as an alleged conspirator in an unlawful takeover attempt]; *McCafferty* v. *Musat* (Colo.Ct.App. 1990) 817 P.2d 1039, 1044 [plaintiff's attorney who was negotiating with and received offer to join law firm that was representing defendant in products liability case had a nonwaiveable conflict of interest].)[5]

---

[5]The parties have not cited and our research has not revealed any California case directly on point. However, two cases from other jurisdictions, *Cinema 5, Ltd.* v. *Cinerama, Inc.*, *supra*, 528 F.2d 1384, and *McCafferty* v. *Musat*, *supra*, 817 P.2d 1039, provide the most closely analogous factual situations we have been able to uncover. In *Cinema 5, Ltd.*, which was cited by our Supreme Court with approval in *Flatt* v. *Superior Court*, *supra*, 9 Cal.4th at pages 286-287, the lawyer who was charged with a conflict of interest was a partner in two different law firms, one in Buffalo, New York, and one in New York City. The court held that when the client retained a member of the Buffalo firm to defend it in the antitrust action, ". . . it was entitled to feel that at least until that litigation was at an end, it had his undivided loyalty as its advocate and champion [citation] and could rely upon his 'undivided allegiance and faithful, devoted service.' " (*Cinema 5, Ltd.* v. *Cinerama, Inc.*, *supra*, 528 F.2d at p. 1386.) The New York City firm was, thus, subject to mandatory disqualification. (*Ibid.*)

*McCafferty* v. *Musat*, *supra*, 817 P.2d 1039, a malpractice case, is most closely on point, although it arose in a true civil litigation (personal injury) context and fails to distinguish between claims of professional negligence and breach of fiduciary duty against a litigator who was accused of providing deficient representation in prosecuting and settling a products liability case because of a conflict of interest. In that case, the plaintiff, McCafferty, was a miner who was seriously injured in a blasting accident. (*Id.* at pp. 1040-1041.) There was evidence that the manufacturer of an explosive fuse cord was negligent in preparing instructions and providing training for the safe use of its product. (*Id.* at p. 1041.) The attorney, Musat, accepted the case and advised McCafferty he had strong claims which would probably yield a settlement that would provide McCafferty with $60,000 a year for the rest of his life. (*Ibid.*) However, approximately five months after filing suit—and unbeknownst to McCafferty—Musat began actively seeking employment with the law firm that was representing the defendant manufacturer. Two months later, prior to completion of substantial discovery, Musat received an offer of employment from the defense firm. (*Ibid.*) Upon receiving the offer, Musat informed his client of the conflict of interest. He also changed his advice about the value of the plaintiff's claims, saying that McCafferty "had no case" against the manufacturer. Musat also conveyed a $5,000 settlement offer to McCafferty and advised him to accept it, calling it a " 'gift' " that was tendered by the defendant as a favor to Musat. (*Ibid.*) McCafferty accepted the settlement offer, and Musat began working at the defense firm. Subsequently, McCafferty sued Musat, claiming that by recommending settlement before adequately pursuing discovery, Musat had breached the retainer agreement and negligently failed to use the degree of skill, knowledge, and judgment ordinarily possessed by members of the legal profession. The issue of Musat's professional negligence was presented in a "trial within a trial," after which the jury found that McCafferty would have recovered $801,600 against the manufacturer of the blasting cord (*id.* at p. 1043), and that Musat was negligent in advising his client about the settlement offer (*id.* at p. 1044). The Colorado Court of Appeals

At oral argument, respondent's counsel contended that Richmond had no conflict of interest and, thus, no duty to obtain appellant's written consent, until the actual "merger" of her practice with that of Chamberlin. That is, although she admittedly agreed to the merger on January 25, and was in the process of performing under that agreement, she contends no conflict of interest arose until she and Chamberlin actually moved into their joint offices in March 1989. We disagree. We recognize that discussions about a law firm merger can take a variety of forms and proceed through many stages—from casual conversation, to serious negotiations, to agreement in principle, to formal agreement, to intensive planning of the details of the merger. At some point in those discussions, the parties *must* confront and resolve (or "clear") the conflicts presented by the merger plan. Out of an abundance of caution, and to avoid the problems that occurred in this case, it may be prudent to obtain written consent from all affected clients as soon as the parties begin serious negotiations toward a merger. That way, if insurmountable conflicts exist, the parties can make a sound decision about whether to proceed with the merger. While it may be difficult, as a general matter, to establish a bright line test for when that point has been reached, we have no difficulty concluding that the line was crossed in this case without a satisfactory resolution of the conflict generated when counsel for a wife and a husband in a hotly contested divorce proceeding agreed to merge their practices before a final disposition of the case.

What was at stake when Richmond agreed to form a new law firm with her opposing counsel, while they continued simultaneously to represent adverse parties in a highly contentious dissolution action, was her *duty of loyalty* to appellant. (See *Flatt* v. *Superior Court, supra*, 9 Cal.4th at p. 284.) ■ Our Supreme Court recently reaffirmed the long-standing definition of an attorney's duty of loyalty to his or her client, as follows: " 'One of the principal obligations which bind[s] an attorney is that of fidelity, the maintaining inviolate the confidence reposed in him by those who employ him, and at every peril to himself to preserve the secrets of his client. [Citations.] This obligation is a very high and stringent one. It is also an attorney's duty to protect his client in every possible way, and it is a violation of that duty to assume a position adverse or antagonistic to his

affirmed the judgment entered on the jury verdict, holding that there was sufficient evidence both as to the manufacturer's negligence in failing to provide adequate safety instructions, and as to Musat's negligence in communicating inaccurate information to his client about the settlement value of the case. (*Id.* at pp. 1044-1045.) That evidence included expert testimony that Musat had a nonwaiveable conflict of interest and should have withdrawn from McCafferty's case as soon as he began seeking employment with the defense firm, and that he had violated that negligence standard of care when he conveyed inaccurate information about the $5,000 settlement offer to McCafferty after seeking and obtaining an offer of employment from opposing counsel. (*Ibid.*)

client without the latter's free and intelligent consent given after full knowledge of all the facts and circumstances. [Citation.] *By virtue of this rule an attorney is precluded from assuming any relation which would prevent him from devoting his entire energies to his client's interests.* Nor does it matter that the intention and motives of the attorney are honest. The rule is designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which he should alone represent.' " (*Flatt* v. *Superior Court, supra,* 9 Cal.4th at p. 289, quoting *Anderson* v. *Eaton* (1930) 211 Cal. 113, 116 [293 P. 788], italics in *Flatt*; see also *Betts* v. *Allstate Ins. Co.* (1984) 154 Cal.App.3d 688, 715-716 [201 Cal.Rptr. 528].)

■ Because a reasonable trier of fact could find that Richmond and Chamberlin agreed on or about January 25 to go into practice together, and were well underway with the logistics of establishing their new law firm, Richmond would have been subject to immediate and " 'automatic' " disqualification under the rule applicable to cases of dual representation. (*Flatt* v. *Superior Court, supra,* 9 Cal.4th at pp. 284-285.) "The reason for such a rule is evident, even (or perhaps especially) to the nonattorney. A client who learns that his or her lawyer is also representing a litigation adversary . . . cannot long be expected to sustain the level of confidence and trust in counsel that is one of the foundations of the professional relationship. All legal technicalities aside, few if any clients would be willing to suffer the prospect of their attorney continuing to represent them under such circumstances." (*Id.* at p. 285.) At a minimum, Richmond was required to make full and timely disclosure of the extent of her relationship with Chamberlin and to obtain appellant's intelligent, informed consent to the dual representation. (*Id.* at p. 285, fn. 4; but cf. *Klemm* v. *Superior Court* (1977) 75 Cal.App.3d 893, 898 [142 Cal.Rptr. 509] ["As a matter of law a purported consent to dual representation of litigants with adverse interests at a contested hearing would be neither intelligent nor informed."].) This, of course, she did not do. Even if she had, however, appellant testified that she would have fired Richmond on January 26 and hired substitute counsel if she had known the extent of Richmond's involvement with Chamberlin on January 25. Instead, Richmond concealed from her client the fact that she had made a commitment to join forces with opposing counsel. On this view of the evidence, Richmond surely violated her duty of loyalty to appellant.

Perhaps more importantly, the evidence is sufficient to show that Richmond's personal interests in having Chamberlin join her in the practice of law as "ostensible partners," before appellant's case could be wrapped up,

actually conflicted with her duty to obtain for her client a reasonable settlement of the outstanding property division issues in the dissolution action. Both appellant and Professor Zitrin testified about several instances of Richmond placing herself in a position where she was required to choose between conflicting duties to her client and her new law partner (or her own self-interest), and arguably resolved those conflicts adversely to her client. For example, there was evidence that Richmond filed a hastily prepared, half-hearted opposition to Chamberlin's motion to compel the sale of the Belvedere house, without informing the court that appellant had almost two more months to finalize her own purchase of her husband's share of the property. Based on this evidence, a reasonable trier of fact could find that Richmond undermined her client's position before the court and weakened her position in the settlement negotiations.

There is also evidence that, in her haste to open her new law firm with Chamberlin, Richmond placed undue pressure on appellant to accept a settlement that was significantly changed in the late stages of the parties' negotiations—after the conflict of interest arose—without performing adequate legal research and without utilizing available time for consideration of certain downside consequences for appellant.[6] Rather than pursuing her motion to be relieved as appellant's counsel, Richmond forged ahead with settlement negotiations on February 16, after predicting to appellant that "the judge would allow the other offer to go forward," and that agreeing to the flawed settlement was "the only way [appellant] could get the house." At trial, Richmond was forced to concede that a continuance of Chamberlin's motion was likely if she had pressed the issue of her conflict of interest. When viewed in the light most favorable to appellant, this evidence could support a finding that, because of a conflict of interest, Richmond overlooked significant drawbacks to her advice that appellant waive her entire interest in the VA pension (with concomitant loss of lifetime health benefits), and accept her husband's community property interest in the Dinkelspiel payments (without an offset for taxes she paid on the capital gain attributable to his half).

Finally, there is evidence that Richmond forced appellant to remove all references to her conflict of interest in her March 7 motion for relief from the judgment. On this evidence, a reasonable trier of fact could find that Richmond was protecting her own professional and economic interests by suppressing this information and, thus, deprived appellant of a plausible ground for obtaining relief from unfavorable aspects of the February 16

---

[6]To the extent expert testimony may have been required to establish the adequacy of Richmond's advice to appellant on the terms of the settlement, Richmond's own testimony was sufficient to satisfy that requirement. (See § III, B., *post.*)

stipulation. Under these circumstances, we conclude that a reasonable trier of fact could find that Richmond violated her fiduciary duties.[7]

**B.** *Respondent's Own Testimony Was Sufficient to Raise a Question of Fact as to Her Negligence in Advising Appellant About the Consequences of Ceding Her Interest in Her Ex-husband's VA Pension, and in Providing for the Tax Consequences of the Dinkelspiel Payments.*

As to her cause of action for professional negligence, appellant contends that the trial court erred in ruling that she did not present sufficient expert testimony about the applicable standard of care and the breach of that standard by Richmond. Specifically, appellant argues that Richmond's complete failure to research the federal statutes and regulations governing the VA pension, and to provide for the tax consequences of the Dinkelspiel payments, were obvious instances of negligence as to which the trier of fact did not need expert testimony. Alternatively, appellant argues that Richmond's own testimony was sufficient to establish the standard of care and the breach elements of her malpractice claim. As we will discuss, we find merit in both of these arguments.

It is well settled in California that an attorney is subject to liability for malpractice when his or her negligent investigation, advice, or conduct of the client's affairs results in loss of a meritorious claim. (*Gutierrez* v. *Mofid* (1985) 39 Cal.3d 892, 900 [218 Cal.Rptr. 313, 705 P.2d 886].) When rendering advice to a client, "[A]n attorney assumes an obligation to his client to undertake reasonable research in an effort to ascertain relevant legal principles and to make an informed decision as to a course of conduct based upon an intelligent assessment of the problem." (*Smith* v. *Lewis* (1975) 13 Cal.3d 349, 358-359 [118 Cal.Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231].) This includes a duty to "discover those additional rules of law which, although not commonly known, may readily be found by standard research techniques." (*Id.* at p. 358.)

Richmond's expert testimony about the standard of care applicable to her advice to appellant about the "pluses and minuses" of waiving her interest in the VA pension was, in all material respects, consistent with the foregoing standards. In addition, respondent acknowledged that she was under a duty

---

[7]In her retainer agreement, Richmond promised appellant she would use her "best efforts on your behalf consistent with the canons of ethics of the legal profession, to provide legal counsel, advice, and representation." The proof that Richmond violated the Rules of Professional Conduct and other fiduciary duties owed to her client is, thus, sufficient to support a claim that Richmond's conduct amounted to a breach of contract as well. (See *Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 181 [98 Cal.Rptr. 837, 491 P.2d 421].)

as a family law specialist "[t]o keep abreast of changes in family law," and that "the status and divisibility of federal—of pensions governed by federal statutes has changed dramatically and unexpectedly over time." Richmond was unquestionably qualified to testify about the standards of care for a family law specialist in advising a client about property division matters and, in fact, gave such testimony. However, because Richmond denied that it was below the standard of care to fail to advise appellant about the consequences of waiving her rights to the VA pension there was no expert testimony on the issue of breach of the applicable standard of care.

This was not a fatal flaw in appellant's prima facie case. ■ "Where a malpractice action is brought against an attorney holding [herself] out as a legal specialist and the claim against the attorney relates to [her] expertise, then only a person knowledgeable in the specialty can define the applicable duty of care and render an opinion on whether it was met. (*Wright* v. *Williams* (1975) 47 Cal.App.3d 802, 810-811. . . .) However, '[w]here the failure of attorney performance is so clear that a trier of fact may find professional negligence unassisted by expert testimony, then expert testimony is not required.' (*Wilkinson* v. *Rives* (1981) 116 Cal.App.3d 641, 647-648. . . ; see also *Wright* v. *Williams*, *supra*, 47 Cal.App.3d at p. 811.) In other words, if the attorney's negligence is readily apparent from the facts of the case, then the testimony of an expert may not be necessary." (*Goebel* v. *Lauderdale* (1989) 214 Cal.App.3d 1502, 1508 [263 Cal.Rptr. 275] [expert testimony from bankruptcy specialist not necessary to establish professional negligence claim against bankruptcy attorney who failed to perform even the most perfunctory legal research and, thus, advised his general contractor client to handle financial affairs in a manner that violated Penal Code section 484b].)

■ Appellant argues that Richmond's breach of the professional standard of care as to two aspects of her advice on the February 16 settlement were "so clear that a trier of fact may find professional negligence unassisted by expert testimony." (*Goebel* v. *Lauderdale*, *supra*, 214 Cal.App.3d at p. 1508.) We agree. Appellant had informed Richmond early in the proceedings that retention of her health coverage—under which she received benefits from 1976 through the date of the final decree and judgment on dissolution in March 1989—was an important goal going into the proceedings by which the marital property would be divided. Appellant also specifically asked for legal advice on the "pluses and minuses" of waiving her interests in Dr. Stanley's VA and UC retirement accounts. Richmond admitted that appellant specifically asked for a letter explaining "the advantages or disadvantages of taking the [UC pension] vs. the [VA] pension."

As in *Goebel* v. *Lauderdale*, *supra*, respondent's advice with respect to the VA pension "demonstrates a total failure to perform even the most perfunctory research" on the *legal* issues presented by Dr. Stanley's proposal that

appellant cede that asset entirely to him.[8] (214 Cal.App.3d at p. 1508.) The testimony of a family law expert was not necessary to establish whether respondent was negligent by failing to perform a simple research task, and by responding to a client's request for advice about the "pluses and minuses" of a decision without the benefit of valuable, and readily available, information. This was *not* an unsettled question of law. It is undisputed that appellant would have been eligible for valuable benefits under the FEHB program if the court had ordered a minimum $1 interest in Dr. Stanley's civil service retirement benefits. (See 5 C.F.R. former § 831.1704.) Although the precise value of those benefits was disputed, there is a showing that they were worth in excess of $14,000.

An attorney who has conducted a "thorough, contemporaneous research effort," demonstrated "detailed knowledge of legal developments and debate in the field," and made a decision which represented a "reasoned exercise of an informed judgment grounded upon a professional evaluation of applicable legal principles," may be entitled to judgment as a matter of law. (*Davis* v. *Damrell* (1981) 119 Cal.App.3d 883, 888 [174 Cal.Rptr. 257].) However, the differences between Richmond's professional conduct and that of the lawyer in *Davis* v. *Damrell, supra*, "inexorably point to potential liability." (*Aloy* v. *Mash* (1985) 38 Cal.3d 413, 418 [212 Cal.Rptr. 162, 696 P.2d 656].) Richmond admitted she did not know about the health benefits available to an unremarried former spouse of a civil servant with only the most minimal stake in the civil servant's pension.[9] She also admitted that she knew there were applicable federal regulations and that the law governing federal pensions had been quite volatile in the years preceding the Stanleys' divorce. Nevertheless, she completely failed to research standard legal materials containing information that was important to her client's decision on the property division. We hold that it was a question of fact within the ken of a lay jury to decide whether respondent's failure to conduct a few minutes—or even a few hours—of legal research, and her failure to discover information

[8]Of course, the criminal conviction of the client in *Goebel* v. *Lauderdale, supra*, 214 Cal.App.3d at pages 1505-1506, was a more severe injury than that suffered by appellant. Nevertheless, the point of that case is that an attorney who fails to perform any research on a question of law as to which the client has sought his or her professional advice, and as to which there is a reasonably clear answer that is "easily discovered through standard research techniques," may be held liable for professional negligence without the benefit of expert testimony from a specialist in the field. (*Id.* at pp. 1508-1509; see also *Smith* v. *Lewis, supra*, 13 Cal.3d at p. 358.)

[9]Richmond did not need to look any further than a family law treatise of which she is now an "Editorial Consultant" to determine that the federal Civil Service Retirement Spouse Equity Act of 1984 (Pub.L. No. 98-615 (Nov. 8, 1984) 98 Stat. 3195) "provides certain health benefits for unremarried former spouses." (1 Cal. Family Law Practice & Procedure (2d ed. 1995) § 21.32[2], p. 21-62; see also 2 Cal. Family Law Practice & Procedure (1st ed. 1989) § 24.43[2], pp. 24-161 through 24-162.)

that could have been "easily discovered through standard research techniques," was a violation of the applicable standard of care. (*Goebel* v. *Lauderdale, supra*, 214 Cal.App.3d at p. 1509.)

 Although it is a closer question, we find the same to be true of Richmond's failure to obtain an offset for the tax liability appellant incurred as a result of the distribution to her of the full amount of the Dinkelspiel payments. There is no dispute that the Dinkelspiel payments were a community asset awarded to appellant in the final distribution of property as part of a strategy to equalize the uneven division of other community assets. Indeed, Richmond admitted as much in the trial of this action. It is settled that, in these circumstances, the tax consequences of the distribution must be considered when there is proof of an immediate and specific tax liability arising in connection therewith, and each party is responsible for one-half of the capital gains taxes incurred by the sale regardless of the party's share of the sale proceeds. (*In re Marriage of Clark* (1978) 80 Cal.App.3d 417, 422 [145 Cal.Rptr. 602]; *In re Marriage of Davies* (1983) 143 Cal.App.3d 851, 856-857, fn. 1 [192 Cal.Rptr. 212].)[10] As Richmond recognizes, both appellant and John McCall testified about these requirements and about the actual tax liability appellant incurred because of the Dinkelspiel payments. Coupled with evidence that Richmond was unnecessarily rushing to finalize the Stanleys' property division, this testimony was sufficient to raise a question of fact as to a negligent failure to provide for the tax aspects of the Dinkelspiel payments.

C. *There Are Questions of Fact Whether Respondent's Breach of Fiduciary Duty and/or Negligence Caused Appellant's Claimed Damages.*

 The only remaining question is whether there was sufficient evidence, either disputed or undisputed, that the alleged breaches of fiduciary duty or professional negligence were legal causes of damage to appellant. (See *Lysick* v. *Walcom* (1968) 258 Cal.App.2d 136, 153 [65 Cal.Rptr. 406, 28 A.L.R.3d 368].) It is plaintiff's burden to establish " 'a reasonable basis for the conclusion that it was more likely than not that the conduct of the defendant was a substantial factor in the result.' " (*Ibid.*) We conclude that appellant's evidence is sufficient to raise questions of fact under this standard of causation.

Viewed in the light most favorable to appellant and with all conflicts and inferences resolved in her favor, there is substantial evidence that, because

[10]Contrary to the argument in Richmond's brief, the 1984 Federal Tax Reform Act (26 U.S.C. § 1041(a)(2)) did not supersede the relevant portions of *In re Clark, supra* (See *In re Marriage of Harrington* (1992) 6 Cal.App.4th 1847, 1852 [8 Cal.Rptr.2d 631].)

of Richmond's plan to go into practice with Chamberlin before the expiration of appellant's right of first refusal, Richmond placed undue pressure on her client to settle the property division issues more quickly than necessary and on less favorable terms than appellant could have obtained without the time constraints. Certainly, a jury could reasonably infer that Richmond's failure to perform reasonable legal research about the advantages of the VA pension was the product either of her neglect or abandonment of appellant's cause, or of her eagerness to put appellant's case behind her so she and Chamberlin could open their new law offices as planned. This inference arises from the facts that on February 14, with only two days to go before Chamberlin's motion was to be heard, appellant discussed the matter with Richmond and asked for her advice; Richmond rendered a written opinion the very next day; and then—accepting appellant's version of the events as true—pressured appellant into a settlement waiving all rights in the VA pension the following day. There is, at most, a question of fact whether Dr. Stanley would have accepted a proposal that allowed appellant to retain a $1 interest in his VA pension so as to preserve her right to a lifetime of very low-cost health benefits. However, on the evidence presented, a jury could reasonably find that such a minimal restructuring of the marital property division would not have been a "deal breaker."[11]

There is also substantial evidence from which a reasonable trier of fact could find that appellant was damaged by Richmond's negligent failure to obtain an offset for the tax liability appellant incurred by accepting the full amount of the community property interest in the Dinkelspiel payments. At the trial of property issues in June 1988, the question of tax consequences attending the distribution of community assets was deferred for the parties' negotiations in connection with the drafting of a judgment. Thus, the issue of tax consequences to appellant due to the Dinkelspiel payments remained an open question until February 16, when the parties read their stipulation into the record. However, that issue was not addressed or resolved in the parties' negotiations and the Dinkelspiel payments were allocated to appellant without any offset for the tax consequences. Thus, the jury could accept or reject appellant's theory that the tax consequences of the Dinkelspiel payments

---

[11]We agree with appellant that testimony about what Dr. Stanley would have done in response to a proposal to reserve for appellant a $1 interest in his VA pension was irrelevant. It would have been nothing more than speculation given Richmond's failure to research appellant's rights under the federal regulations. As we have discussed, Dr. Stanley initiated the proposal to take the VA pension in connection with appellant's purchase of his interest in the Belvedere house. The VA pension had an actuarial value of $64,000. He wanted the VA pension. He had demonstrated some flexibility in structuring the sale of the house to appellant when he offered to take "the VA retirement or UC or both or whatever works out." The difference between $64,000 and $63,999 is so minimal that the jury could easily find specious the suggestion the $1 difference would have been a deal killer.

should have been considered but were overlooked—with the net result that appellant received less than one-half of the community property—either because Richmond did not want to challenge Chamberlin on the issue or was in a hurry to finalize the property division so they could get on with their new law practice. In addition, based on Richmond's own characterization of the events of February 16, the jury could reasonably infer from "the totality of the confused and pressured atmosphere surrounding the making of the stipulation and the fact that its terms run counter to [appellant's] purpose in making it" that a mistake had been made in the final computations, and that it was Richmond—not appellant—who had made it.

Of course, as Richmond correctly notes, a violation of the Rules of Professional Conduct does not, in and of itself, render an attorney liable for damages. (Rule 1-100; *Noble* v. *Sears, Roebuck & Co.* (1973) 33 Cal.App.3d 654, 658 [109 Cal.Rptr. 269, 73 A.L.R.3d 1164]; *Mirabito* v. *Liccardo, supra,* 4 Cal.App.4th at p. 46, fn. 2.) However, the evidence in this case is capable of showing that appellant's interests in an equal division of the marital property were prejudiced by Richmond's conduct in violation of her fiduciary duties, as well as by professional negligence. (Cf. *Mirabito* v. *Liccardo, supra,* 4 Cal.App.4th at p. 45 [client suffered financial losses from estate planning attorney's advice to invest in businesses in which attorney had a personal interest].)

Finally, we note that appellant appears to claim a right to recover damages for emotional distress suffered as a result of Richmond's conflict of interest. Richmond impliedly concedes that such damages are recoverable if directly caused by the attorney's conduct in breach of her fiduciary duties. (*Branch* v. *Homefed Bank* (1992) 6 Cal.App.4th 793, 800 [8 Cal.Rptr.2d 182]; *McDaniel* v. *Gile* (1991) 230 Cal.App.3d 363 [281 Cal.Rptr. 242]; and cases collected in *Cooper* v. *Superior Court* (1984) 153 Cal.App.3d 1008, 1010-1013 [200 Cal.Rptr. 746].) If credited by the jury, appellant's testimony about the extreme pressure she was under and her state of mind during the last few weeks of Richmond's representation—including feelings of abandonment and betrayal by her attorney, anxiety over her possible loss of her family home, and undue pressure to obtain financing on a timetable established for the benefit of her attorney and opposing counsel—as well as her loss of lifetime health benefits, may well be sufficient to support an award of damages for emotional distress from the alleged breaches of fiduciary duty.

### III. CONCLUSION

Of course, we express no opinion about the ultimate disposition of appellant's claims. We merely hold that the trial court erred by ruling that she did

not make a prima facie showing of each element of her causes of action for breach of fiduciary duty, professional negligence, and breach of contract. For all the foregoing reasons, the judgment of the trial court is reversed and the cause remanded for a new trial. Costs to appellant.

Smith, Acting P. J., and Haerle, J., concurred.