Filed 8/26/20  Stahl Law Firm v. Apex Medical Technologies CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| STAHL LAW FIRM et al, <br><br> Plaintiffs, Cross-defendants and Appellants, <br><br> v. <br><br> APEX MEDICAL TECHNOLOGIES, INC., et al., <br><br> Defendants, Cross-complainants and Appellants. | D072906 <br><br><br> (Super. Ct. No. 37-2010-00097839-CU-CP-CTL) |

APPEALS from a judgment of the Superior Court of San Diego County, Katherine Bacal, Judge.  Affirmed as modified.

Norbert Stahl, in pro. per., for Plaintiffs, Cross-defendants and Appellants.

Arthur A. Wellman, Jr. for Defendants, Cross-complainants and Appellants.

This appeal arises from a dispute over legal fees and the quality of the legal services for which those fees were charged. In 2007 and 2008, I-Flow Corporation (I-Flow) filed lawsuits against Apex Medical Technologies, Inc. (Apex) and Zone Medical LLC (Zone) alleging patent infringement and trade secret misappropriation. Norbert Stahl, the sole attorney for Stahl Law Firm, represented Apex and Zone in the litigation. I-Flow prevailed at trial and, thereafter, the parties negotiated a settlement of the dispute.

Thereafter, Stahl filed a complaint against Apex, Zone, and a number of company officers, including Mark McGlothlin, Alice DePaul, and Michael Marasco (collectively, the Zone Defendants) seeking recovery for unpaid legal fees related to the I-Flow litigation. The Zone defendants responded with a cross-complaint alleging professional malpractice and breach of fiduciary duty. After the Zone Defendants presented their affirmative evidence on the cross-complaint, the superior court granted a motion for nonsuit on the professional malpractice cause of action. At the conclusion of the case, the jury found in favor of the Zone defendants on all remaining causes of action and awarded damages to Zone, Apex, and McGlothlin pursuant to their claim for breach of fiduciary duty.

Stahl appeals from the judgment and asserts the damages awarded to Zone, Apex, and McGlothlin must be vacated as a matter of law in light of the allegations in the cross-complaint, the superior court's grant of nonsuit, and

2

inconsistencies in the special verdict form submitted by the jury. The Zone Defendants cross-appeal and argue the superior court erred by granting Stahl's motion for nonsuit on the professional malpractice cause of action. In a separately-filed motion, the Zone Defendants ask this court to dismiss Stahl's appeal based on the disentitlement doctrine.

We decline to exercise our discretion under the disentitlement doctrine to dismiss Stahl's appeal. We conclude the superior court did not err by granting the motion for nonsuit and that the damages awarded to Apex and Zone were appropriate but that the damages awarded to McGlothlin must be vacated.

## FACTUAL AND PROCEDURAL BACKGROUND

*Underlying Litigation (The Patent Litigation)*

McGlothlin and DePaul founded Apex in 1985 and founded Zone in or around 2007. Apex manufactured an elastomeric infusion pump called the Solace pump and Zone distributed the pump. I-Flow also manufactured and sold elastomeric infusion pumps, and the pumps sold by Apex competed with I-Flow's pumps for market share.

In late 2006, I-Flow sent a letter to McGlothlin, as president of Apex. I-Flow alleged that the Solace pump infringed United States Patent No. 5,284,481 (the '481 Patent), which had been assigned to I-Flow, and demanded that Apex immediately stop making, using, or selling the Solace

3

pump. Apex sent the letter to a patent attorney, Henry Heines. Heines conducted an analysis of the '481 patent and determined the Solace pump did not infringe any claims of the patent. He sent a letter to I-Flow's attorneys containing his analysis.

On June 29, 2007, I-Flow filed a complaint in the federal district court for patent infringement against Apex. Just a few days later, on July 3, Stahl sent an unsolicited letter to McGlothlin, as president of Apex, noting the complaint filed by I-Flow and offering to represent Apex. In the letter, Stahl stated that he was "a patent attorney with over 10 years of experience in helping inventors and companies in patent matters in Courts and in the Patent Office."

In August, Heines provided Apex with a detailed non-infringement opinion, in which he concluded that neither the Solace pump nor any of the commercial activities associated with it infringed the '481 Patent.[1]

In September, McGlothlin engaged Stahl to represent Apex and Zone in patent prosecution related to catheter technology and the Patent Litigation. The engagement letter indicated Stahl would charge an hourly rate of $280 for his services, with a $20 per hour discount for litigation services.

---

[1] It is common practice for a company or individual threatened with patent litigation to obtain such a written opinion of counsel as a basis to avoid treble damages based on the willful infringement of the patent. (See *Halo Electronics, Inc. v. Pulse Electronics, Inc.* (2016) 136 S.Ct. 1923, 1935.)

4

Thereafter, I-Flow named McGlothlin as a defendant in the federal lawsuit against Apex and filed a second complaint against Zone. The cases were consolidated and I-Flow amended its complaint to add claims for trade secret misappropriation, breach of confidence, and unfair competition. Specifically, I-Flow alleged that Apex obtained and disclosed I-Flow trade secrets. I-Flow also alleged that McGlothlin personally obtained and disclosed confidential business information.

At the conclusion of the trial, in October 2009, the jury found that the '481 Patent was valid and that Apex willfully infringed claims 1, 2, and 15. The jury awarded I-Flow nearly $3 million on the patent claims. The jury also found that Apex and McGlothlin willfully and maliciously misappropriated at least one of I-Flow's trade secrets, breached I-Flow's confidence, and engaged in unfair competition against I-Flow. The jury awarded approximately $9 million in damages to I-Flow on those claims, with the liability split between Apex and McGlothlin.

*Litigation Between Stahl and the Zone Defendants (The Malpractice/Fee Litigation)*

The following February, Stahl filed a complaint against the Zone Defendants seeking approximately $100,000 in unpaid legal fees. The complaint listed the following five causes of action: 1) breach of contract; 2) breach of covenant of good faith and fair dealing; 3) quantum meruit for services rendered; 4) open book account; and 5) account stated.

5

The Zone Defendants asserted numerous affirmative defenses and also filed a cross-complaint alleging causes of action for professional malpractice and breach of fiduciary duty. In the professional malpractice cause of action, they alleged that Stahl failed to conduct proper investigation and discovery; failed to retain, designate, and prepare appropriate expert witnesses; failed to submit complete expert reports; failed to designate relevant witnesses, evidence, and transcripts at trial; failed to adequately prepare for trial; and abandoned the Zone Defendants on the eve of trial. With respect to the breach of fiduciary duty cause of action, the cross-complainants alleged Stahl placed his financial interests above those of his clients, the legal fees reflected in Stahl's invoices "were excessive, unreasonable and not consistent with actual time devoted to the matter," and that Stahl abandoned the Zone Defendants at a critical stage of the case.

*Nonsuit on Professional Malpractice Cross-Claim*

Stahl filed a motion for nonsuit on the claims asserted in the cross-complaint at the outset of the trial. He asserted that the Zone Defendants could not prove causation of damages because they had not designated a number of witnesses or exhibits from the Patent Litigation and, therefore, could not prove that the outcome of the case would have been different but for Stahl's alleged errors. The Zone Defendants responded that they could prove causation without putting on all of the evidence from the Patent Litigation by

6

presenting testimony that was not presented in the underlying trial and opinions regarding whether that testimony would have changed the outcome of the Patent Litigation.

The superior court found that there was no evidence to show a breach of confidentiality and no allegation in the cross-complaint that Stahl represented another party with a conflicting interest and granted the nonsuit with respect to those issues only. The court denied the motion in all other respects based on the Zone Defendants' assertion that they intended to present evidence sufficient to support each element of their asserted claims. The court noted that the denial was without prejudice and that Stahl could bring the motion again at the conclusion of the cross-complainants' case, at which point the court would be able to decide whether the Zone Defendants had presented sufficient evidence to defeat Stahl's nonsuit motion.

After the Zone Defendants rested their case with respect to the cross-complaint, Stahl renewed his motion for a nonsuit. Stahl asserted the Zone Defendants had not presented sufficient evidence from the Patent Litigation to prove that the outcome would have been any more favorable to them but for Stahl's alleged negligence. The Zone Defendants conceded that they had not presented all of the evidence that was presented in the Patent Litigation but argued that they had established several things would not have happened but for Stahl's negligence and that the jury could determine

7

whether Stahl's negligence was a substantial factor in the outcome of the underlying case. The superior court concluded the Zone Defendants had not presented sufficient evidence to support the causation element of the professional malpractice cause of action and granted the nonsuit as to that cause of action.

With respect to the breach of fiduciary duty cause of action, the Zone Defendants asserted they had proved they would not have retained Stahl had they known his true qualifications, that his fees were not properly earned, and that they suffered damage as a result. The court again noted that the breach of fiduciary duty cause of action included allegations regarding excessive, unreasonable, and inconsistent billing by Stahl. The court therefore denied Stahl's motion as to the breach of fiduciary duty cause of action.

*Jury Instruction and Verdict*

With the agreement of both parties, the court instructed the jury regarding damages for the breach of fiduciary duty claim as follows:

> "If you decide that Apex Medical Technologies, Inc., Zone Medical, LLC, and/or Mark McGlothlin has proved its or his claim against Norbert Stahl, you must also decide how much money will reasonably compensate Apex Medical Technologies, Zone Medical, LLC, and/or Mark McGlothlin for the harm. · This compensation is called damages. · The amount of damages must include an award for each item of harm that was caused by Norbert Stahl's wrongful conduct

8

even if the particular harm could not have been anticipated.

"Apex Medical Technologies, Inc., Zone Medical, LLC, and/or Mark McGlothlin did not have to prove the exact amount of damages that will provide reasonable compensation for the harm. However, you must not speculate or guess in awarding damages.

"The following are the specific items of damages claimed by Apex Medical Technologies, Inc., Zone Medical, LLC, and Mark McGlothlin:

"Legal fees paid to Norbert Stahl related to the I-Flow versus Apex litigation."

The jury found in favor of the Zone Defendants on all of the claims asserted by Stahl and found that Stahl was not entitled to any additional fees for his work on the Patent Litigation. The jury also found in favor of the Zone Defendants on the breach of fiduciary duty cause of action and awarded damages in the amount of $156,192.60 to Apex, $52,064.20 to Zone, and $312,385.20 to McGlothlin.

*Post-Trial Motions*

Stahl filed a motion for judgment notwithstanding the verdict (JNOV) and requested a stay of execution of the judgment and a new trial on the issue of damages. He argued the damages awarded for breach of fiduciary duty must have been based on the outcome of the underlying case rather than excessive fees, given the allegations in the cross-complaint and the answers the jury submitted on the special verdict form. The Zone Defendants

9

filed a motion for prevailing party attorney fees and for disgorgement of the $520,641.54 in fees that they previously paid to Stahl.

The superior court found the special verdict form could be reconciled as to Apex and Zone. However, the court noted that the jury found that McGlothlin did not request legal services or have any financial transactions with Stahl, concluded that those responses indicated that Stahl did not owe a fiduciary duty to McGlothlin, and granted the JNOV with respect to McGlothlin. The court ruled that the defendants were the prevailing parties and that Apex and Zone were entitled to recover their fees.[2] The court noted that the amount sought in disgorgement was duplicative of the amount of damages awarded by the jury on the breach of fiduciary duty claim and denied that request. However, the court deemed the motion to be a motion for new trial on the issue of damages and granted the request.

Stahl appealed, and, in a previous opinion, this court determined the superior court did not have jurisdiction to grant a new trial on damages and

---

[2] Stahl separately appealed from the subsequent order awarding attorney fees and we address the fee award in more detail in an opinion filed concurrently in case number D073155. The Zone Defendants ask us to take judicial notice in this case of the superior court's order awarding fees from the record in case number D073155. As that order was issued after the judgment that is appealed from here, and because we address the fee award in our concurrently filed opinion in case number D073155, we hereby deny the request. (See *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 ["Reviewing courts generally do not take judicial notice of evidence not presented to the trial court."].)

10

that the JNOV had been denied by operation of law. (See *Stahl Law Firm v. Apex Medical Technologies, et al.* (Dec. 19, 2016, D068929) [nonpub. opn], mod. Jan. 1, 2017.) We affirmed the denial of the JNOV by operation of law based, in part, on Stahl's failure to provide a complete record on appeal, and reversed the superior court's order granting a new trial on damages. (*Ibid*.)

The matter was remanded to the superior court and the superior court entered a judgment based on the previous verdict, awarding damages in the amounts of $156,192.60 to Apex, $52,064.20 to Zone, and $312,385.20 to McGlothlin.

Stahl appeals and the Zone Defendants cross-appeal.

DISCUSSION

*I. Motion to Dismiss*

While the appeal was pending, the Zone Defendants filed nearly identical motions to dismiss this appeal and the appeal in case number D073155 pursuant to the disentitlement doctrine. In their briefing, the Zone Defendants also assert that the appeal should be dismissed under the disentitlement doctrine.[3]

---

3    The Zone Defendants asked for a hearing on this motion, and we allowed the parties to address the motion during oral argument on the appeals. (See California Rules of Court, rule 8.54, subd. (b)(2).)

11

*A. Relevant Legal Principles Regarding the Disentitlement Doctrine*

The disentitlement doctrine allows an appellate court to use its inherent power to dismiss an appeal based on a party's failure to comply with a lower court order. (See *Stoltenberg v. Ampton Investments, Inc.* (2013) 215 Cal.App.4th 1225, 1229-1230 (*Stoltenberg*).) "A party to an action cannot . . . ask the aid and assistance of a court in hearing his demands while he stands in an attitude of contempt to legal orders and processes of the courts of this state." (*MacPherson v. MacPherson* (1939) 13 Cal.2d 271, 277 (*MacPherson*).) The doctrine has been applied in a variety of cases, including where a judgment debtor has attempted to frustrate or obstruct legitimate efforts of the trial court to enforce a judgment. (*Stoltenberg*, at pp. 1230-1232 [discussing various cases in which courts dismissed appeals based on the disentitlement doctrine].) A formal judgment of contempt is not required. (*Ibid.*)

That said, " '[a]ppellate disentitlement' is not a jurisdictional doctrine, but a discretionary tool that may be applied when the balance of the equitable concerns make it a proper sanction.' " (*Stoltenberg, supra,* 215 Cal.App.4th at p. 1230.) " 'The right to an appeal must not be lightly forfeited, and where a doubt exists as to a litigant's conduct being contumacious or wilful, an appellate court will tolerate temporarily the acts which were disruptive of the judicial process. We always prefer to resolve a

12

cause on its merits; once the rights of the parties have been determined with finality, then the thwarted authority and offended dignity of the court may be assuaged with condign sanctions to the extent of the affront.' " (*Id.* at pp. 1231-1232, quoting *Tobin v. Casaus* (1954) 128 Cal.App.2d 588, 592-593.)

## B. Analysis

The Zone Defendants assert that Stahl's appeal should be dismissed because he has continually refused to comply with court orders and raise several specific examples to support that assertion.

### 1. Failure to Pay Previously Ordered Sanctions

First, the Zone Defendants assert that Stahl was sanctioned for misconduct during discovery and failed to pay the sanctions until forced to do so by the superior court. The Zone Defendants raised this issue during trial and alleged that Stahl was in contempt for having failed to pay the sanctions. The superior court clarified that it had not yet made a finding of contempt but that it could issue an order to show cause regarding contempt if Stahl did not pay the sanctions that day. Stahl provided a check to counsel for the Zone Defendants later that day, in court, and counsel for the Zone Defendants agreed that the check was sufficient. As the Zone Defendants concede, Stahl was not held in contempt and this issue is now resolved. Accordingly, this is not a basis for application of the disentitlement doctrine. (See *Stoltenberg*, *supra*, 215 Cal.App.4th at pp. 1231-1232.)

13

## 2. *Failure to Provide a Current Address*

Next, the Zone Defendants allege that Stahl sold his home and went "into hiding" after the judgment was entered, and that he has since disobeyed an order of the superior court and the California Rules of Court by failing to provide a current address to the superior court or to this court on appeal.

The superior court issued an order on April 12, 2017 requiring Stahl to update his physical address with the court. Stahl did not comply with the order and, instead, started listing an incomplete address on his filings, both in the superior court and in this court. The superior court has noted Stahl's failure to comply with its order but has declined to issue an order to show cause or to make a contempt finding.

In a related argument, the Zone Defendants further assert that Stahl filed a stipulation in this court to extend the time to file certain appellate briefs with a forged electronic signature. They do not dispute that they agreed to the extension but contend that their attorney refused to approve the stipulation in the form that Stahl provided because Stahl had not included a current address as required by the applicable Rules of Court.[4]

---

[4] The Zone Defendants also seek an order from this court requiring Stahl to produce the original signature page in court for inspection and copying in accordance with California Rules of court, rule 8.75. We hereby deny that request. The stipulation does not contain an original signature submitted under penalty of perjury and, therefore, California Rules of court, rule 8.75 is not applicable.

The Zone Defendants argue that Stahl stands in contempt of the superior court order as a matter of fact since he has not updated his address and rely on Code of Civil Procedure section 1211 to assert that "[b]eing in contempt of court is a factual situation." We disagree. Code of Civil Procedure section 1211 allows for direct adjudication of contempt that occurs in a judge's immediate presence, in which case the judge must recite the facts of contempt as they occurred, or for indirect adjudication of the contempt based on affidavits. (See Code Civ. Proc., § 1211; *Hanson v. Sup. Ct.* (2001) 91 Cal.App.4th 75, 82.) It does not permit an appellate court to decide that contempt occurred in the trial court as a factual matter.

That said, the disentitlement doctrine has been applied in the absence of a formal judgment of contempt, particularly where a judgment debtor acts to obstruct legitimate efforts to enforce a judgment. (*Soltenberg, supra*, 215 Cal.App.4th at p. 1230.) However, cases in which appeals have been dismissed typically involve more significant efforts to avoid enforcement, including, for example, moving out of the country and refusing to respond to post-judgment interrogatories, refusing to deposit money into a trustee account as ordered by the court, and refusing to appear despite an outstanding bench warrant. (*Id.* at pp. 1230-1232; *Stone v. Bach* (1978) 80 Cal.App.3d 442, 448; *MacPherson, supra*, 13 Cal.2d at p. 277 [dismissing appeal where appellant "wilfully and purposely evaded legal processes and

15

contumaciously defied and nullified every attempt to enforce the judgments and orders of the California courts, including the very order from which he seeks relief by this appeal"].)  Stahl has not demonstrated a similar level of obstruction here.

Thus, while we do not condone Stahl's refusal to follow the order of the superior court to provide a current address, or his refusal to follow the California Rules of Court requiring that he provide a current mailing address to this court and that he include a current mailing address on the cover of any document filed with the court, we decline to exercise our discretion to dismiss the appeal on this basis.  (See *Soltenberg*, *supra*, 215 Cal.App.4th at p. 1230; see also Cal. Rules of Court, rules 8.32, subd. (b)(1) and 8.40, subd. (b)(1).)

### 3. The San Mateo Proceedings

The Zone Defendants include significant details in their motion to dismiss and the associated appendix about proceedings in the superior court in San Mateo, and a related appeal in the first appellate district, in which they sought to enforce the judgment, and assert these proceedings are further evidence of Stahl's attempts to evade the judgment.

Stahl asserts we should not consider these materials as they were not before the lower court.  However, motions may be based on matters outside the record and may be supported by declarations and other supporting

16

materials. (See Cal. Rules of Court, rule 8.54, subd. (a)(1); *Norco Delivery Service, Inc. v. Owens Corning Fiberglas Inc.* (1998) 64 Cal.App.4th 955, 961, fn. 3.)

Regardless, though, the materials related to the San Mateo proceedings do not establish any failure by Stahl to comply with a court order. The appellate court there ultimately determined that the trial court erred by ordering Stahl to appear without adequately establishing jurisdiction, and the Zone Defendants concede that the trial court subsequently vacated its previous order requiring Stahl to appear for examination. Accordingly, even if we were to consider those materials, they do not provide a basis for application of the disentitlement doctrine. (See *Stoltenberg, supra,* 215 Cal.App.4th at pp. 1229-1230.)

### 4. *Mischaracterization of the Record*

As a final matter, the Zone Defendants assert that Stahl has continually mischaracterized the record, in the superior court and on appeal. As an attorney, Stahl has duty of candor to the court which precludes him from making false statements of fact or law. (See Prof. Conduct, Rule 3.3; Bus. & Prof. Code, § 6106.) A violation of that duty may result in sanctions or a referral to the state bar for disciplinary proceedings. (See *Bryan v. Bank of America* (2001) 86 Cal.App.4th 185, 194 (*Bryan*) [concluding sanctions in the form of attorney fees were the appropriate consequence for counsel's

17

misrepresentations]; *In the Matter of Maloney and Virsik* (Review Dept. 2005) 4 Cal. State Bar Ct. Rptr. 774, 786.)

Here, the Zone Defendants assert Stahl made false statements to the court in the San Mateo proceedings and falsely indicated that he had consent from opposing counsel to file the stipulation to extend the time to file briefs. As discussed, *ante*, we decline to dismiss the appeal based on the San Mateo proceedings or Stahl's filing of the stipulation.

In addition, the Zone Defendants assert Stahl has repeatedly mischaracterized the record in his briefing on appeal. To support their argument, they cite to a section of Stahl's opening brief in which Stahl argues the Zone Defendants admitted that they spied on and copied from I-Flow in the Patent Litigation. In that section of his brief, Stahl includes an excerpt from a post-trial motion submitted by I-Flow (hereinafter, exhibit 293) in which I-Flow argued it presented evidence of deliberate copying by the Zone Defendants at trial in the Patent Litigation. He explains that exhibit 293 is a post-trial motion submitted by I-Flow in the Patent Litigation and asserts that it was admitted at trial in the Malpractice/Fee Litigation. The Zone Defendants assert that the I-Flow document was admitted in the Malpractice/Fee Litigation only for the limited purpose of showing what I-Flow's allegations were and implies that Stahl is misrepresenting the record by suggesting that exhibit 293 proves that the Zone Defendants actually

18

admitted to copying. We do not read Stahl's brief as misrepresenting the nature of exhibit 293. Regardless, even if we did, this is a dispute over the legal significance of exhibit 293; it is not a material misrepresentation of the record warranting dismissal of the appeal.

The Zone Defendants do not identify any other material misrepresentations, nor have they pursued a motion for sanctions based on any such misrepresentations.[5] (See *Bryan*, *supra*, 86 Cal.App.4th 185 at p. 194.)

We therefore decline to dismiss the appeal under the disentitlement doctrine.

## II. *Appeal and Cross-Appeal*

Stahl argues the damages awarded to Apex, Zone, and McGlothlin must be reversed as a matter of law as they are inconsistent with the allegations in the cross-complaint, the superior court's grant of nonsuit, and the special findings of the jury. In their cross-appeal, the Zone Defendants argue that the superior court erred in granting Stahl's motion for nonsuit and by limiting the testimony of their expert on damages. We address the issues

---

[5] We note that the superior court reported Stahl to the California State Bar based on the jury's finding that he breached his fiduciary duty to the Zone Defendants.

19

raised in the cross-appeal first, as the nonsuit ruling directly impacts the scope of recoverable damages.

A. *The Superior Court Did Not Err by Granting Stahl's Motion for Nonsuit on the Professional Malpractice Cause of Action*

1. *Relevant Legal Principles*

In cases in which the " 'negligence resulted in the plaintiff's loss of the prior lawsuit, the plaintiff must establish: (1) the professional was negligent in the handling of the prior lawsuit; (2) the professional's negligence was a substantial factor in the plaintiff's loss of the prior lawsuit; *and* (3) the proper handling of the prior lawsuit by the professional would have resulted in a [ ] judgment in plaintiff's favor.' " (See *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 844 [emphasis added].)

As the California Supreme Court has explained:

> "In a litigation malpractice action, the plaintiff must establish that *but for* the alleged negligence of the defendant attorney, the plaintiff would have obtained a more favorable judgment or settlement in the action in which the malpractice allegedly occurred. The purpose of this requirement, which has been in use for more than 120 years, is to safeguard against speculative and conjectural claims. [citation] It serves the essential purpose of ensuring that damages awarded for the attorney's malpractice actually have been caused by the malpractice. [citation]" (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1241 (*Viner*), citing *Mattco, supra*, 52 Cal.App.4th at pp. 832-834.)

20

The method for proving causation of damages in such cases, where the attorney is accused of losing the client's legal claim or defense, is often referred to as putting on a " 'trial within a trial' " or a " 'case within a case' " (*Viner*, *supra*, 30 Cal.4th at p. 1240, fn. 4; *Mattco*, *supra*, 52 Cal.App.4th at pp. 832-833; *Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1531.) It is not necessary that the plaintiff present all of the evidence from the underlying action, but it is necessary that the plaintiff put forth sufficient evidence to prove that the lawyer's errors were the cause of the less than favorable outcome or, conversely, that the plaintiff would have received a more favorable outcome absent those errors. (See *Mattco*, at pp. 831-832, 837; *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 973 (*Piscitelli*).) By contrast, the method for proving causation in cases arising from transactional matters, where there was no trial, may be described as a " 'no deal' " or " 'better deal' " scenario. (*Viner*, *supra*, 30 Cal.4th at p. 1240, fn. 4.) In both types of cases, "the crucial causation inquiry is *what would have happened* if the defendant attorney had not been negligent." (*Id.* at p. 1242.)

In some cases, expert testimony is essential to establish the causal link between the alleged misconduct and the resulting damages. (4 Mallen, Legal Malpractice (2020 ed.) § 37:125 (*Mallen*).) Evidence or testimony that the lawyer was negligent, without more, may not be sufficient to allow the jury to determine what the result would have been in the absence of that negligence.

21

(*Ibid.*; see also *Viner, supra*, 30 Cal.4th at p. 1242; *Orrick Herrington & Sutcliffe v. Sup. Ct.* (2003) 107 Cal.App.4th 1052, 1057 (*Herrington*) ["Simply showing the attorney erred is not enough."].)  In cases where the causal link is not obvious or established by other evidence, expert testimony may be necessary to prove what a competent lawyer would have done differently and how the alleged negligence proximately caused the injury.  (*Mallen*, at § 37:125; cf. *Piscitelli, supra*, 87 Cal.App.4th at pp. 971-973 [expert may not directly testify as to the ultimate result of the underlying case].)

To determine whether the superior court erred by granting Stahl's motion for nonsuit on the legal malpractice cause of action in this case, we must determine whether the Zone Defendants presented substantial evidence, including any expert testimony, from which the jury could have concluded that the outcome of the Patent Litigation would have been more favorable to them absent Stahl's negligence.  (See *Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1086 (*Stanley*); *Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 839 [discussing the standard of review for a nonsuit ruling].)  In making that determination, we may not weigh the evidence or consider the credibility of witnesses.  (*Stanley*, at p. 1086.)  We accept as true the evidence most favorable to the Zone Defendants, indulge all legitimate inferences which may be drawn from that evidence, and disregard any conflicting evidence.  (*Ibid.*; see also *Viner v. Sweet* (2004) 117 Cal.App.4th

22

1218, 1226 (on remand) (*Viner II*) [trial court erred by denying a JNOV based on causation where "the Viners presented no evidence at all, substantial or otherwise, indicating that, but for [the lawyers'] negligence, it was more likely than not they would have obtained a more favorable result"].)

2. *Evidence Presented at Trial Relevant to the Malpractice Claim*

We begin our analysis with a summary of the evidence presented at trial in the Malpractice/Fee Litigation with respect to the professional malpractice cause of action.

a. *Evidence Presented by the Zone Defendants*

Company officers McGlothlin, Marasco, and DePaul each testified regarding their roles in the companies, the underlying litigation, and Stahl's representation.

McGlothlin said he believed the value of Stahl's work was "negative millions of dollars" because Stahl took away the opportunity to get alternate trial counsel with adequate experience.

Emil Soika, the named inventor on the '481 patent, explained his background and his role in discovering the inventions claimed in the '481 patent. Using the claim construction issued by the court in the Patent Litigation, Soika opined that the Solace pump did not infringe any of the asserted claims of the '481 patent. Soika explained that he testified as a fact witness at trial in the Patent Litigation but that he was precluded from

23

providing his opinion that the Solace pump did not infringe the patent. He said that he reviewed the patent, the Solace pump, and his prior testimony before testifying in the Malpractice/Fee Litigation, but that he did not review the testimony of the other experts, including Richard Meyst, the non-infringement expert that did testify on behalf of the Zone Defendants in the Patent Litigation.

Henry Heines was designated as an expert in patent law, allegations of infringement, and claim construction pursuant to 35 U.S.C. section 112, paragraph 6,[6] and testified regarding his analysis of the '481 patent. He discussed the non-infringement opinion he provided to McGlothlin at the outset of the Patent Litigation and stated that he did not speak with Stahl at any point prior to the trial in the Malpractice/Fee Litigation. Like Soika, Heines did not review any of the materials from the trial in the Patent Litigation and did not offer any opinions regarding the outcome of the case.

Perry De Fazio was designated as an expert witness regarding competitive intelligence in the field of medical devices and, specifically, I-

---

[6] At the time of the patent litigation, 35 U.S.C. section 112, paragraph 6 (now 35 U.S.C. section 112 (f)), defined a particular type of patent claim often referred to as a "means plus function" claim. These types of claims allow the patentee to describe a physical element of an invention by describing the precise function that the element (the "means") performs, as opposed to the more traditional method of describing the precise physical structure necessary to perform the function. (See *Biomedino, LLC v. Waters Techs. Corp.* (Fed.Cir. 2007) 490 F.3d 946, 947.)

Flow infusion pumps in the Patent Litigation.  At trial in the Malpractice/Fee

Litigation, he explained the work he did locating information about the trade

secrets that I-Flow had alleged and testified that he submitted an expert

report in the Patent Litigation, but that he ultimately was not permitted to

share his opinions with the federal jury.  He opined that the trade secrets

alleged by I-Flow were not confidential.  He could not recall the specifics of

the alleged trade secrets but believed the focus was on sales and marketing,

as opposed to the technical aspects of the product.

Matthew Murphey, an attorney, was designated as an expert in patent

litigation and the standard of care appropriate for attorneys in California

practicing patent litigation.  He opined as to the following breaches of the

standard of care by Stahl:  (1) Stahl improperly solicited business from Apex

and Zone by misrepresenting his own qualifications and background ; (2)

Stahl failed to comply with the patent local rules and the relevant standard

of care by failing to identify certain claims as means plus function claims

pursuant to 35 U.S.C. section 112, paragraph 6 ; (3) Stahl failed to designate

Soika and Heines as experts in the Patent Litigation; (4) Stahl failed to

provide a complete expert report for De Fazio, which caused the court in the

Patent Litigation to limit the scope of his testimony ; and (5) Stahl's invoices

included excessive hours for certain tasks.  On cross-examination, Murphey

confirmed that he did not attend the trial in the Patent Litigation, did not

review the entire record, and did not have knowledge regarding any expert witnesses presented by the Zone Defendants other than Soika, Heines, and DeFazio.

Finally, Robert Wallace, a CPA, was designated to testify as to the damages caused by the breaches of the standard of care identified by Murphey. Before Wallace took the stand, Stahl pointed out that Wallace's testimony should be limited in accordance with that designation and the court stated that it expected Wallace to opine as to the damages caused by the breaches of the standard of care identified by Murphey.

Wallace testified that he understood that Apex and Zone were precluded from selling the Solace pump as a result of their loss in the Patent Litigation. He then stated that he calculated lost profits based on the assumption that the Zone Defendants would not have lost the Patent Litigation absent Stahl's errors. Stahl objected to any testimony regarding the lost profits that Wallace calculated based on that assumption as beyond the scope of Wallace's designation. On the same basis, Stahl also objected to questions asking Wallace to assume the Zone Defendants would not have reached the settlement they did if the results of the Patent Litigation had been different. The superior court sustained the objections, thereby precluding Wallace from offering any testimony based on the assumption that

26

the outcome of the Patent Litigation would have been different but for Stahl's errors.

Ultimately, Wallace was able to testify that Stahl billed a total of $624,107 for his work on the Patent Litigation, and the Zone defendants paid Stahl a total of $520,642.

### b. Evidence Presented by Stahl

Stahl testified on his own behalf and explained that he disclosed and produced the non-infringement opinion prepared by Heines in the Patent Litigation, but that he intentionally designated Meyst to testify as a non-infringement expert instead of Soika. In addition, he designated another expert, Jeffrey Charlton, to testify regarding the technical trade secrets alleged by I-Flow, including dip molding methods.

Neither Meyst nor Charlton testified in the Malpractice/Fee Litigation.

### 3. Analysis

As the superior court concluded, the Zone Defendants failed to make a prima facie showing on causation because they did not present sufficient evidence from which the jury could conclude that the outcome of the Patent Litigation would have been more favorable to them absent Stahl's negligence. (See *Viner*, *supra*, 30 Cal.4th at p. 1241.)

### a. The Testimony of Soika, Heines and DeFazio Was Not Sufficient to Establish the Zone Defendants Would Have Prevailed in the Patent Litigation Absent Stahl's Errors

27

The Zone Defendants contend, as they did at trial, that they presented evidence sufficient to prove causation because they presented expert testimony, not presented in the Patent Litigation, that they did not infringe the '481 patent and did not use or disclose any of I-Flow's trade secrets.

Specifically, at trial in the Malpractice/Fees Litigation, the Zone Defendants asserted, and Murphey opined, that Stahl committed professional malpractice in the Patent Litigation by failing to designate and/or adequately disclose the expert opinions of Soika, Heines, and De Fazio. As a result, Soika, Heines, and De Fazio were precluded from presenting all of their opinions at trial in the Patent Litigation. Soika, Heines, and De Fazio then presented the opinions that were allegedly excluded in the Patent Litigation. Soika and Heines testified that the Zone Defendants did not infringe the '481 patent, and DeFazio testified that the Zone Defendants could not have misappropriated I-Flow's alleged trade secrets were not actually secret.

The Zone Defendants assert this evidence was sufficient to allow the jury to conclude that Stahl's errors were a substantial factor in causing the harm they suffered as a result of the verdict in the Patent Litigation, but it was not. (See *Viner*, *supra*, 30 Cal.4th at pp. 1241-1242.) Inherent in the Zone Defendant's assertion is an assumption that they would have prevailed in the Patent Litigation if Soika, Heines, and De Fazio had presented the

28

same testimony there as they did in the Malpractice/Fee Litigation. That assumption, however, is both erroneous and unsupported by the evidence.

It is undisputed that Stahl designated several other expert witnesses in the Patent Litigation. At least two of those experts testified at trial in the Patent Litigation on behalf of the Zone Defendants and in defense of both the patent infringement and trade secrets claims. However, the Zone Defendants did not present any evidence at trial in the Malpractice/Fee Litigation regarding the testimony of those other experts. In addition, Murphey, the Zone Defendants' expert on Stahl's breaches of the standard of care, conceded that he did not review the entire record from the Patent Litigation and that he did not have any knowledge regarding the testimony of the other experts that did testify. Similarly, Soika and Heines also had not reviewed the complete record from the Patent Litigation and, thus, also could not opine on the relative impact of their own testimony.

Without any evidence regarding the opinions offered by the experts that *did* testify in the Patent Litigation, the jury in the Malpractice/Fee Litigation had no way to know whether the additional testimony of Soika, Heines, and De Fazio would have had any impact on the outcome of the litigation. More importantly, the jury had no way to know if there was a void in the expert testimony that was presented at trial in the Patent Litigation that Soika, Heines, and De Fazio would have filled. If, for example, the

29

experts that did testify in the Patent Litigation offered essentially the same opinions that Soika, Heines, and De Fazio offered in the Malpractice/Fee Litigation, the testimony of Soika, Heines, and De Fazio would not have changed the outcome. Accordingly, the testimony of Soika, Heines, and De Fazio was not sufficient, on its own or in combination with Murphey's testimony regarding Stahl's errors, to support a finding that the Zone Defendants would have received a more favorable outcome in the Patent Litigation absent Stahl's errors. (See *Mattco, supra,* 52 Cal.App.4th at pp. 831-832, 837; *Piscitelli, supra,* 87 Cal.App.4th at p. 973; *SiRF Technology, Inc. v. Orrick Herrington and Sutcliffe LLP* (N.D.Cal., June 22, 2010) 2010 WL 2560076 at * 12, 16 (*SiRF*) [evidence regarding supplemental expert reports excluded in patent infringement action as a result of alleged legal malpractice insufficient to prove causation absent evidence that the outcome of the litigation would have been different if the reports had been submitted].)

Moreover, with respect to the trade secret claims, the jury was not presented with a detailed description of the alleged trade secrets and De Fazio testified that he could no longer recall the specifics of the trade secrets he had previously analyzed. Absent evidence regarding the full detailed list of alleged trade secrets, there was no way for the jury to determine if De Fazio's additional testimony was sufficient to prove that none of the alleged

30

trade secrets were actually trade secrets. Thus, as with the other expert witnesses, DeFazio's testimony also was not sufficient to establish a causal link between the exclusion of that testimony and the outcome of the Patent Litigation. (See *Viner, supra,* 30 Cal.4th at p. 1241; *Herrington, supra,* 107 Cal.App.4th at p. 1057; see also *Piscitelli, supra,* 87 Cal.App.4th at pp. 971-973.)

The Zone Defendants assert that they did not have to put forth every item of evidence that was before the jury in the Patent Litigation. We agree that the Zone Defendants did not need to put forth *all* of the evidence from the Patent Litigation, but it was nevertheless their burden to put forth *enough* evidence to prove they would have received a more favorable outcome in the Patent Litigation absent Stahl's errors. (See *Mattco, supra,* 52 Cal.App.4th at pp. 832, 837; *Viner, supra,* 30 Cal.4th at p. 1241.) As discussed, they failed to do so.

In a related argument, the Zone Defendants assert *Stanley, supra,* 35 Cal.App.4th 1070, relied upon by Stahl, supports their position because the court in *Stanley* did not discuss the case within a case method for proving causation. We disagree. The errors in *Stanley* were related to the drafting of a martial settlement agreement (MSA), which is more akin to transactional malpractice than litigation malpractice. In *Viner*, which was decided eight years after *Stanley*, our Supreme Court noted that the phrase "case within a

31

case" refers to a method for proving causation that is typically used in cases alleging litigation, as opposed to transactional, malpractice. (See *Viner*, *supra*, 30 Cal.4th at p. 1240, fn. 4.) Regardless, the Court in *Viner* confirmed that in both types of cases, the plaintiff "must show that *but for* the alleged malpractice, it is more likely than not that the plaintiff would have obtained a more favorable result." (See *Ibid.* at p. 1244.) As discussed, here the Zone Defendants did not establish that they would have obtained a more favorable result in the Patent Litigation absent Stahl's errors. (See *Stanley*, at pp. 1095-1097 [overturning the trial court's nonsuit ruling after concluding Stanley presented sufficient evidence "from which a reasonable trier of fact could find [Stanley] was damaged by [her attorney's negligence]"; *Viner*, *supra*, 30 Cal.4th at p. 1241 ["It is the failure of the client to establish the causal link that explains decisions where the loss is termed remote or speculative"].)[7]

---

[7] The Zone Defendants also rely on *In re Fountain* (1977) 74 Cal.App.3d 715 (*In re Fountain*) and *Slovensky v. Friedman* (2006) 142 Cal.App.4th 1518 (*Slovensky*), but those cases are not instructive here. *In re Fountain* was a criminal case in which the defendant asserted his right to obtain an appeal despite his attorney's failure to file a timely notice of appeal. (*In re Fountain*, at p. 717.) Along with granting the defendant's writ petition, the court ordered that the negligent attorney return all fees paid to him in the representation. (*Id.* at 719.) In *Slovensky*, the court noted the order in *In re Fountain*, but concluded disgorgement of fees was not warranted where the attorney's negligence had caused the client no damages. (*Slovensky*, at p. 1535.)

32

In sum, the Zone Defendants did not present sufficient evidence from which the jury in the Malpractice/Fee Litigation could have concluded that Stahl's errors were a significant factor in the outcome of the Patent Litigation or that they would have received a more favorable verdict in the absence of those errors. (See *Mattco*, *supra*, 52 Cal.App.4th at p. 840; *Viner II*, *supra*, 117 Cal.App.4th at p. 1226; *SiRF*, *supra*, 2010 WL 2560076 at * 12, 16.) As a result, the superior court correctly determined that the Zone Defendants did not make a prima facie showing on the causation element of the legal malpractice cause of action and granted Stahl's motion for nonsuit as to that cause of action. (See *Viner II*, at p. 1226.)

> ### b. The Zone Defendants Did Not Present Sufficient Evidence to Establish a Causal Link Between Stahl's Claim Construction Errors and the Outcome of the Patent Litigation

The Zone Defendants also assert they presented evidence that Stahl failed to identify certain elements of the asserted claims as means-plus-function elements, thereby waiving the argument, and that the jury likely would not have found that the Solace pump infringed the claim under an appropriate claim construction. However, the Zone Defendants failed to provide the jury in the Malpractice/Fee Litigation with an alternative claim construction that addressed the alleged means-plus-function elements. Claim construction is a matter of law to be decided by the court and, here, it

33

is undisputed that the Zone Defendants did not ask the court in the Malpractice/Fee Litigation to issue its own claim construction. (See *Markman v. Westview Instruments* (1996) 517 U.S. 370, 390 [claim construction is a matter of law for the court, not the jury]; see also *New Tek Mfg. v Beehner* (2005) 270 Neb. 264, 272-274, 276 [concluding claim construction, including whether a claim is in a means-plus-function format, is a matter of law for the state court to decide in a legal malpractice case].) The jury in the Malpractice/Fee Litigation could not determine whether the Solace pump would have infringed under an alternate mean-plus-function construction that was never provided to them. Therefore, the Zone Defendants once again failed to provide sufficient evidence from which the jury could conclude that they would have prevailed in the Patent Litigation in the absence of Stahl's error

> #### c. The Zone Defendants' Remaining Arguments are Not Sufficiently Developed or Supported by Citations to the Record or Law

The Zone Defendants raise additional arguments regarding the nonsuit ruling in a perfunctory manner and without citation to the record. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 (*Benach*) ["An appellant must provide an argument and legal authority to support his contentions"]; Cal. Rules of Court, rule 8.204(a)(1)(C) [briefs must support any reference to a matter in the record by citation].) It is the appellant's

34

burden to affirmatively demonstrate error. (*Fundamental Investment etc. Realty Fund v. Gradow* (1994) 28 Cal.App.4th 966, 971.) "It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness." (*Benach*, at p. 852.)

Specifically, the Zone Defendants allege "[h]ad Stahl been candid about his qualifications, abilities, and the proceedings in the case, he never would have been retained, never [would have] been permitted to be solely in charge of the case, [would have] been terminated, and would not have been paid." They further allege that, "Had Stahl been candid with his clients, they might have taken a settlement offer that would have resulted in a net monetary gain, instead of loss". The Zone Defendants did not present these arguments in the superior court, do not develop them in their briefing on appeal, and do not provide citations to the record or legal authority to support them. (See *Benach*, *supra*, 149 Cal.App.4th at p. 852.) Therefore, they have not met their burden to affirmatively establish error on these bases. (See *Ibid*.)

> d. *The Superior Court Did Not Err by Limiting the Scope of Wallace's Testimony*

As a final matter, the Zone Defendants argue that the superior court improperly limited the testimony of Wallace, their damages expert, by precluding him from testifying as to damages suffered as a result of the adverse verdict and subsequent settlement in the Patent Litigation. They

assert the superior court's error in this regard arose from the same error as the court's nonsuit ruling. To the contrary, it is the Zone Defendants' argument that is based in the same erroneous assumption.

It is within the superior court's role as a gatekeeper to exclude expert opinions based on assumptions that are not supported by the evidence. (*See Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771; Evid. Code, § 801.) Here, as discussed *ante*, the Zone Defendants failed to present sufficient evidence to establish that they would have prevailed in the Patent Litigation absent Stahl's negligence in failing to adequately identify and designate Soika, Heines, and DeFazio as experts. As a result, the superior appropriately excluded Wallace from offering his opinions on damages based on the unsupported assumption that the Zone Defendants would have prevailed in the Patent Litigation absent Stahl's errors.

Moreover, for largely the same reason, the Zone Defendants have not shown any prejudice as a result of the excluded testimony. (See *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 857 [" 'an erroneous evidentiary ruling requires reversal only if "there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error" ' "].) The excluded testimony would not have established the missing causal link between Stahl's errors and the outcome of

36

the Patent Litigation and, thus, would not have had any impact on the nonsuit ruling.

For the foregoing reasons, we conclude that the superior court did not err by granting Stahl's motion for nonsuit with respect to the Zone Defendants' professional malpractice cause of action.

B. *The Damages Awarded to Apex and Zone for Stahl's Breach of Fiduciary Duty Were Appropriate but the Damages Awarded to McGlothlin Must be Vacated as a Matter of Law*

Turning now to Stahl's appeal, Stahl argues the damages awarded to Apex, Zone, and McGlothlin must be vacated as a matter of law based on the damages claimed in the cross-complaint, the Superior Court's nonsuit ruling, and the related findings of the jury.

1. *Forfeiture*

As Stahl acknowledges, the failure to move for a new trial ordinarily precludes a party from complaining on appeal that the damages awarded were excessive. (See *Jamison v. Jamison* (2008) 164 Cal.App.4th 714, 719; *Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 122 (*Glendale*).) However, as Stahl asserts, his arguments address legal errors in the judgment, which may be raised on appeal without the filing of a motion for new trial. His arguments are not based on the specific amount of damages awarded and do not require weighing the evidence or resolution of conflicts in the evidence. (See *Glendale*, at p. 122.)

37

They are based, instead, on the appropriate measure of damages, which is a matter of law. (*Ibid.* ["The failure to move for a new trial, however, does not preclude a party from urging legal errors in the trial of the damage issue such as . . . failure to apply the proper legal measure of damages."].)

### 2. *Relevant Legal Principles*

A breach of fiduciary duty cause of action is a type of tort that is distinct from professional malpractice. (*Stanley*, *supra*, 35 Cal.App.4th at p. 1086.) "The elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach. [Citation]." (*Ibid.*)

As a type of tort, a breach of fiduciary claim is governed by Civil Code section 3333, which states: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

An attorney has a duty "to charge only fair, reasonable, and conscionable fees," and, thus, a client may state a claim for breach of fiduciary duty by alleging the attorney billed at an inflated rate or billed for work not complete. (*Bird, Marella, Boxer & Wolpart v. Sup. Ct.* (2003) 106 Cal.App.4th 419, 431; *Charney v. Colbert* (2006) 145 Cal.App.4h 170, 182.) Of particular relevance here, the court in *Herrington* found the plaintiff did not

38

produce any evidence showing he would have obtained a more favorable judgment or settlement but for the attorney's misconduct but allowed a breach of fiduciary duty claim to proceed based on the potential for recovery of the fees paid to the attorney. (*Herrington, supra*, 107 Cal.App.4th at pp. 1058-1059.) The court stated, "[i]f he [the plaintiff] can prove he did not receive value for his payment, he may recover damages 'to the extent' the fees exceed the value of the services received." (*Id*. at p. 1060.)

### 3. *Standard of Review*

Determination of whether a party is entitled to a particular measure of damages is a question of law subject to de novo review. (*Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 691; *Glendale, supra*, 66 Cal.App.3d at p. 123.) We also review assertions that special verdict findings are inconsistent de novo. (*Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1316.)

### 4. *Analysis*

#### a. *The Jury Properly Awarded Damages to Apex and Zone Based on the Legal Fees They Paid to Stahl*

We turn first to the damages awarded to the companies, Apex and Zone. Stahl asserts the jury's findings on the special verdict form indicate the jury awarded damages to Apex and Zone based on the outcome of the

Patent Litigation and the damages must therefore be vacated based on the nonsuit ruling.

In their cross-complaint, the Zone Defendants alleged that Stahl failed to adequately prepare the case for trial, abandoned them on the eve of trial, placed his own financial interests above those of his clients, and submitted invoices that "were excessive, unreasonable and not consistent with actual time devoted to the matter."[8]  However, as explained *ante* in section II.A., the superior court correctly determined that the Zone Defendants did not meet their burden to present sufficient evidence from which the jury could have concluded that the outcome of the Patent Litigation would have been more favorable to them absent Stahl's errors, and therefore granted the motion for nonsuit with respect to the professional malpractice cause of action.

Given the court's ruling on the nonsuit, the only damages available to the Zone Defendants for breach of fiduciary duty were those based on the overpayment of legal fees to Stahl.  (See *Slovensky*, *supra*, 142 Cal.App.4th 1533 ["[t]o the extent plaintiff's fiduciary breach claim alleges the same damages as her malpractice claim, it fails for the same reason."].)  Indeed, the

---

8    The Zone Defendants moved to amend their pleadings according to proof at trial and the court granted the motion in part, allowing a narrow amendment to include an allegation that Stahl breached his fiduciary duty "by making false and/or misleading statements to his clients regarding events in and the status of the case."  However, it does not appear that a Second Amended Cross-Complaint was filed.

parties agreed to instruct the jury as follows: "The following are the specific items of damages claimed by Apex Medical Technologies, Inc., Zone Medical, LLC, and Mark McGlothlin: **Legal fees paid to Norbert Stahl related to the I-Flow versus Apex litigation**." (Emphasis added.)

Stahl's assertion that the jury awarded damages based on the outcome of the Patent Litigation is contrary to the court's ruling on the motion for nonsuit and the instruction given to the jury. In the absence of evidence indicating otherwise, we must presume the jury followed the court's instruction on damages. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803 (*Cassim*); *City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 901 (*Ripon*).) Moreover, as the superior court noted in a subsequent discussion regarding disgorgement, the total amount of damages awarded is equal to the total amount of fees Apex and Zone paid to Stahl. Thus, we conclude that the jury awarded the Zone Defendants, including Zone and Apex, damages based on the legal fees paid to Stahl, consistent with the agreed upon instructions given to them by the court.

As he did in the prior appeal in case number D073155, Stahl relies on the jury's response to questions 30 and 34 of the special verdict to assert that the jury could not have awarded damages based on the legal fees paid to

41

Stahl.[9]  We addressed these same assertions in our prior opinion and concluded that Stahl's interpretation of the jury's response to these questions was incorrect.  (See D068929 Slip Op. at pp. *18-25.)  Stahl's argument in this appeal is no different and our previous analysis applies equally here.  (See *Sefton v. Sefton* (2015) 236 Cal.App.4th 159, 172, fn.  6.)

Apex and Zone were entitled to damages based on the legal fees that they paid to Stahl, and the record indicates that the jury appropriately awarded them damages on that basis.  (See *Herrington*, *supra*, 107 Cal.App.4th at pp. 1058-1059.)  We therefore find no error in the judgment with respect to the damages awarded to Apex and Zone.

> b. *McGlothlin Was Not Entitled to Damages Based on Legal Fees Because He Did Not Personally Pay Any of Stahl's Legal Fees*

McGlothlin, on the other hand, cannot recover damages for fees paid to Stahl in excess of the value received because he did not personally pay any of Stahl's legal fees.  McGlothlin testified that he signed the engagement letter

---

9      Question 30 relates to the affirmative defense of set off.  In the immediately preceding questions, the jury concluded the Zone Defendants paid more than the reasonable value of services rendered by Stahl.  Question 30 asked the jurors "What are each Defendants' damages due to those overpayments?" and the jurors responded, "$0" for each defendant.  Question 34 follows the award of damages for the breach of fiduciary duty cause of action, set forth in question 33, and asks, "For each Cross-Complainant for which you entered an amount greater than zero, are the damages you awarded in response to question 33, if any, in addition to the damages you found, if any, in response to question 30?"  The jury responded, "No."

with Stahl on behalf of Apex and Zone, and not in his personal capacity. He suggested that Stahl represented him personally in the case as well, but Stahl confirmed that he billed all of the work, whether it was for Apex, Zone, or any of the named officers, on a single invoice, and Marasco and DePaul both testified that Apex and Zone paid the invoices out of company funds.

As a corporation and an LLC, Apex and Zone were themselves distinct legal entities. (See *Abrahim & Sons Enterprises v. Equilon Enterprises, LLC* (2002) 292 F.3d 958, 962 ["Corporations and LLCs are distinct legal entities, separate from their stockholders or members."].) Thus, even as an officer and/or majority shareholder, McGlothlin was not entitled to recover damages in his personal capacity based on legal fees paid by Apex and Zone. (See *Tan Jay Internat v. Canadian Indemnity Co.* (1988) 198 Cal.App.3d 695, 706 (*Tan Jay*) ["One individual does not, under our law, become entitled to a damage award for injuries sustained by another, and a corporation is a distinct legal entity apart from its shareholders"]; *Truestone, Inc. v. Travelers Ins. Co.* (1976) 55 Cal.App.3d 165, 169 ["The allegation that conduct of the defendants reduced the value of the Campbells' shares by injury to the corporation, standing alone, does not establish a personal cause of action in the Campbells since the diminution of value is incidental to injury to their corporation"].) Since McGlothlin did not personally pay any of Stahl's legal fees, he cannot personally recover damages based on the payment of those fees.

Stahl asserts that jury must have awarded damages to McGlothlin based, instead, on the outcome of the Patent Litigation. Specifically, he argues the jury's responses to questions 13 and 18 of the special verdict are inconsistent and cannot be reconciled with the verdict if we interpret the verdict as awarding fees to McGlothlin based on the overpayment of legal fees to Stahl. (See *Singh v. Southland Stone, U.S.A, Inc.* (2010) 186 Cal.App.4th 338, 357 ["A special verdict is inconsistent if there is no possibility of reconciling its findings with each other."].) We disagree.

In response to question 13, the jury found that McGlothlin did not "request, by words or conduct, that Stahl Law Firm perform services for [his] benefit". The evidence showed that Stahl did represent McGlothlin in the Patent Litigation, though, not necessarily at McGlothlin's request, but in connection with his representation of the companies, Apex and Zone. Thus, the jury's response to question 13 is not inconsistent with the verdict.

In response to question 18, the jury found that McGlothlin did not have any "financial transactions" with Stahl, which is consistent with the evidence indicating McGlothlin did not personally pay any of Stahl's legal fees. However, the jury was not instructed that McGlothlin could not recover damages based on legal fees paid to Stahl by Apex and Zone. Thus, it is possible that the jury awarded damages for legal fees paid to Stahl based on a mistaken presumption that McGlothlin could recover personally as a

44

company officer. Indeed, the jury was instructed that the only specific damages claimed by the Zone Defendants with respect to the breach of fiduciary duty cause of action were the legal fees paid to Stahl. We presume the jury followed this instruction. (See *Cassim*, *supra*, 33 Cal.4th at p. 803; *Ripon*, *supra*, 100 Cal.App.4th at p. 901.)

The Zone Defendants argue that McGlothlin established damages "going well beyond disgorgement." However, they do not identify any specific damages not related to the outcome of the Patent Litigation or the overpayment of legal fees to Stahl. As discussed, *ante*, the superior court correctly found that the Zone Defendants did not present adequate evidence upon which the jury could conclude that the outcome of the case would have been different but for Stahl's errors. The only remaining basis for damages on the fiduciary duty cause of action before the jury was the fees paid to Stahl. As we have concluded, though, McGlothlin was not entitled to damages based on legal fees that he did not personally pay. Accordingly, we agree with Stahl that the damages awarded to McGlothlin in his personal capacity must be vacated as a matter of law.

C. *Costs*

As a final matter, Stahl asserts the award of costs should also be vacated but provides no authority for the assertion. As discussed more fully in our concurrently filed opinion in D073155, the Zone Defendants were still

45

the prevailing party as they prevailed on the claims asserted against them by Stahl and were therefore entitled to costs.

## DISPOSITION

The judgment is modified by striking the $312,385.20 in damages awarded to McGlothlin.  In all other respects, the judgment is affirmed.  The parties are to bear their own costs on appeal.


IRION, J.

WE CONCUR:


BENKE, Acting P. J.


O'ROURKE, J.